## JOHN L. MARSO v. MANKATO CLINIC, LTD.

153 N. W. (2d) 281.

September 15, 1967—Nos. 40,520, 40,541.

106

*Pfau, Pfau & Lamm* and *McLean, Peterson, Sullivan & Etzell,* for appellant.

*Blethen, Ogle, Gage & Krause,* for respondent.

NELSON, JUSTICE.

Consolidated appeals by defendant Mankato Clinic, Ltd., from an order denying its motion for a new trial and from a judgment reforming and rescinding plaintiff's employment contract with it. Defendant seeks reversal of the order and judgment, a determination that the employment contract has not been breached, and a determination that defendant is entitled to a permanent injunction prohibiting plaintiff from competitive medical practice in the Mankato area.

Due to the equitable nature of this case, the trial court utilized the jury in an advisory capacity. In its findings of fact and conclusions of law the court determined that the employment contract between plaintiff and defendant was ambiguous and that plaintiff was entitled to reformation; that plaintiff was also entitled to judgment terminating and rescinding the contract and dismissing defendant's counterclaim with prejudice

and on the merits; and that the temporary injunction previously granted to defendant be dissolved.

Defendant is a professional association of doctors established in 1958 as a partnership and incorporated in April 1962. The Mankato Clinic Building Company (also a defendant but not an appellant herein) is a Minnesota business corporation which owns the clinic property. Plaintiff, Dr. John L. Marso, is a physician, specializing in obstetrics and gynecology, who became an employee of the partnership September 1, 1959, and a shareholder in and employee of defendant clinic from the time of its incorporation until June 1, 1965.

Basically, defendant used the "equal share" principle in compensating member physicians. Under this scheme, all senior physicians received the same compensation regardless of their specialty, patient load, or amount of money brought into the group. Prior to 1959 there was no uniform system by which junior physicians could progress to full-share status. The articles of partnership provided that shares of member physicians could be modified by the clinic "for any cause that shall, in its judgment, require such modification." The result was often a "personality contest" among the junior physicians for progression in the percentage shares they received as compensation. The record substantiates that progression among junior physicians was uneven and that such a method of promotion was not the best available. To rectify this situation, a partnership meeting of the clinic members was held in May 1959. The minutes of the meeting demonstrate a definite desire to change the "present Partnership progression system."

In the course of investigating a new method, four different plans of progression were considered. Three of the plans (A, B, and D) provided for automatic advances after stated time intervals. Plan C provided for advances between minimum and maximum time intervals. It is significant that this plan received no support from the members because it still allowed periodic adjustments by themselves and thus would, in effect, perpetuate the "personality contest" which they were trying to avoid. On June 22, 1959, the members adopted plan D, which was described on the ballot as an "automatic progression plan for distribution of earnings." This system of progression was incorporated into

revised articles of partnership adopted as of July 1, 1959, and incorporated by reference into partnership employment contracts thereafter, so from that date the partnership operated under an agreement providing for progression in the percentage shares of the partners based on the number of years of membership, with each partner entitled to progressive increases in his share as a matter of right upon continued membership for the stated periods of time.

After the Minnesota legislature enacted a professional corporation law in 1961, the clinic converted from a partnership to a corporation but continued the automatic progression system adopted by the partnership. In April 1962 the professional corporation became effective and issued contracts to all member physicians. The contracts were identical in form and contained the former progression plan. In essence, they authorized the board of directors to determine the base salary for all members, and junior physicians were given certain percentages of this base salary, dependent upon their position in the progression scheme.

Paragraph 2 of the form contract executed by plaintiff, as well as by all shareholding physicians, provided:

"The Board of Directors of First Party shall determine the base salary of physicians and surgeons employed by First Party, which said base salary shall be applicable to all physicians and surgeons employed for a period of two years or more which said period of time shall include the period which said physician or surgeon was a member of Mankato Clinic, a co-partnership. Second Party shall be paid a sum of money monthly equal to 55 per cent of such base salary and which said payments shall continue up to and including the 31st day of December, 1964; thereafter a sum of money equal to 75 per cent equal to such base salary up to and including December 31, 1967, and thereafter a sum of money equal to 90 per cent of such base salary monthly up to and including December 31, 1969, and thereafter a sum of money equal to 100 per cent of such base salary monthly up to and including November 30, 1992."

The employment contract contains no reference to the question of whether an employee could receive increases in his share of income

sooner than the schedule provided in the contract. Nor does it include any provision as to whether other employees would be limited to the same type of percentage progression granted to each individual employee.

The employment contract also contained a restrictive covenant which prohibited employees or partners from competitive medical practice within 25 miles of Mankato for a period of 5 years after termination of the contractual relationship by either party.

Sometime in February 1959 plaintiff became interested in practicing medicine in Mankato. He then discussed future employment with Dr. John J. Eustermann, one of the partners, and Mr. George E. Lehigh, the business manager of the clinic. Plaintiff testified that he was told that defendant was an "equal share clinic"; that is, regardless of specialty, when an employee reached 100 percent of the base, he would receive the same income as others did at 100 percent.

Plaintiff testified that Dr. Eustermann told him that the "personality contest was over" and that "not too long ago * * * progression and the way a man progressed in the partnership had been on the basis of a personality contest." Plaintiff said also that the progression system was explained to him and that under it, after two years on a salary basis, "all men would progress alike starting at 50 percent for 3 years, 3 years at 75 percent and then 2 years at 90 percent. This was outlined very specifically."

Following numerous visits and telephone conversations with clinic members, plaintiff was employed by the partnership on September 1, 1959, for a term of one year. After intervening contracts, plaintiff executed a partnership contract effective January 1, 1962, and later a contract of employment with the successor professional corporation.

In September 1961 Dr. Gene Sherrill was employed by defendant. Although he had practiced his specialty for almost 8 years, he was admitted on the lowest step of the standard automatic progression plan. As with plaintiff, at the time Dr. Sherrill was hired, Mr. Lehigh, defendant's business manager, represented to him that all physicians progressed alike and all senior physicians shared equally in defendant's earnings. Dr. Victor Schlossberg, employed in August 1963, accepted

employment with the same understanding as to progression as that of Dr. Sherrill and plaintiff. An information sheet which was used by defendant in recruiting doctors described the plan as follows:

"SALARIES

\* \* \* \* \*

"As a Member—Automatic Progression:
"2 yrs. @ 65%  [percentages translated into
"3 yrs. @ 75%   dollar value omitted]
"2 yrs. @ 90%
"Thereafter to age 65 @ 100%."

When plaintiff commenced work with defendant, he and Dr. George McNear were the primary obstetrical physicians. In December 1962 Dr. McNear was prevented from advancing on the salary schedule. After being notified of this action by the board of directors, Dr. Hobert J. Setzer, who was hired about the time plaintiff was and who was under the impression that the automatic progression plan was in effect, proposed that regular meetings between the board and the staff be held to air opinions. Nothing was done. When plaintiff was informed of the action taken by the board with respect to Dr. McNear, he protested that the action was contrary to the contract. Dr. McNear left defendant in July 1964.

Other than Dr. McNear, everyone continued on the 8-year progression schedule until January 1, 1964, when Dr. Claire Strobel, a specialist in surgery, was granted a stepped-up progression to 100 percent in 5 years by the board of directors. The record shows that no shareholders' meeting was ever called to discuss Dr. Strobel's accelerated progression, although evidence indicated it was decided on May 6, 1963, almost summarily and without discussion. Plaintiff learned of Dr. Strobel's change in December 1963; Dr. Sherrill was unaware of this development until January 1964.

After learning of the accelerated progression contract given to Dr. Strobel, Drs. Sherrill and Setzer and plaintiff wrote a letter of protest to the board of directors. This letter, among other things, contained three recommendations to the board:

"1. We believe that five years before gaining the top salary is more reasonable at the present time.

"2. We would like the Board to consider its future policy regarding all economic negotiations concerning the established progression procedure. We do not want the recent change from the norm to start a precedent that could be enjoyed by any present or in-coming member. Therefore, in our opinion, we think the group should establish a definite position regarding its future policy on this question.

"3. It is our profound belief that alterations in policy, as pertaining to negotiation [of] salaries and other monetary problems, must come before the entire participating group for approval before any change shall be authenticated."

Testimony shows that plaintiff also complained of the action by the board to various members, claiming a contract violation. Nothing was done except that the board reduced the overall 8-year progression to 7 years.

In June 1964 plaintiff received an increase to 85 percent because he was the only remaining physician in the obstetrical department. He was told that this was a temporary increase because of the situation, but that a change in the progression system was under way.

In September 1964 Dr. Donald Swenson, a pediatrician who had been practicing in the Mankato area for a number of years, was admitted on a 3-year progression to 100 percent (even though his gross income was about one-half that produced by plaintiff). On September 23, 1964, plaintiff wrote to the board, protesting the departure from the progression schedule, and demanded an immediate 100-percent share for himself. On September 28, 1964, plaintiff discussed the matter before the board and left the meeting with the understanding that a study of the progression arrangement was under way and that he would be advanced to 90 percent on January 1, 1965, even though his contract did not call for such progression until January 1, 1968. In reliance on this action, plaintiff paid up his clinic investment on January 11, 1965.

Although plaintiff was advanced to 90 percent 3 years earlier than his contract called for, he was of the impression that the advance was

temporary because the board did not change the progression system or even have discussions concerning it. Because plaintiff was not given a guarantee that he would not regress from the 90 percent to what his contract called for, he submitted his resignation effective May 31, 1965.

In his amended complaint plaintiff seeks reformation and rescission of his employment contract with defendant, claiming defendant breached the contract by unilaterally altering the progression schedule in individual cases. Defendant's position is that the progression schedule was not a fixed and invariable arrangement and that the "practice of the parties under the contract clearly evidences their understanding of the contract terms." Defendant argues also that plaintiff's conduct in demanding and accepting a stepped-up progression schedule 2 to 3 years ahead of the schedule in his own employment contract amounted to ratification by plaintiff of defendant's position that it had the right to vary the contracts of individual employees without thereby breaching contracts of those who remained on the same salary basis. Defendant also seeks enforcement of the restrictive covenant against plaintiff.

While defendant assigns 16 errors on its appeal to this court, the overriding legal issue is whether the contract provision relating to progression within the medical group was ambiguous and, if so, was meant to provide that all junior members would advance to full participation according to a fixed schedule from which there would be no deviation. If the latter is true, then the next legal issue is whether plaintiff's conduct amounted to a waiver, thereby estopping him to claim a breach.

The trial court submitted two questions to the jury. These, and the jury's answers, were:

"One, do you find from the evidence that the agreement between the defendant Mankato Clinic and the plaintiff Dr. Marso was that all junior members of the Clinic would advance to full income participation according to a fixed progression schedule from which there would be no deviation in individual cases? Yes, 10 votes.

"Do you find from the evidence that Dr. Marso's conduct amounted to a waiver of (that is, acquiescence to) the Mankato Clinic's actions of which he complains in this action? No, 10 votes."

In his findings of fact the trial judge found that the written contract was ambiguous with respect to the progression by which employees would advance from fractional- to full-share participation in corporate income. Further, that the positions taken by defendant and plaintiff are "equally consistent with the language used in the written documents so that resort must be had to the surrounding circumstances and dealings of the parties to ascertain their agreement."

The trial court then adopted as a finding the special verdict of the jury determining that all junior members of defendant would advance from fractional- to full-share participation in group income according to a fixed schedule equally applicable to all those similarly situated by reason of seniority. Holding that the verdict "is adequately established by the record," the trial court determined that insofar as the written documents "are inconsistent with, or susceptible of different interpretation," they "do not reflect the agreement of the parties."

The trial court also adopted the special verdict in which the jury found that "plaintiff's conduct and negotiation with defendant * * * did not waive the breach." The trial court concluded:

"* * * Plaintiff is entitled to reformation of the documents executed between the parties * * *.

"Plaintiff is entitled to judgment terminating the contractual relationship * * * and rescinding the same in all of its terms * * *.

\* \* \* \* \*

"Plaintiff is entitled to judgment dismissing the counterclaim of the defendant * * * and dissolving the temporary injunction previously granted * * * whereby plaintiff was restrained from the practice of his profession within a radius of 25 miles of the City of Mankato."

■ In the context of the events out of which this controversy arose, the necessity for construction of the parties' contract is apparent.

"* * * A written contract is little more than a scrap of writing save as it operates with legal effect on matters extraneous to itself. Construction deals with the dynamic rather than the static phase of the instrument. The question is not just what words mean literally, but how they are

intended to operate practically on the subject matter. Thus, seemingly plain language becomes susceptible of construction, and frequently requires it, if ambiguity appears when attempt is made to operate the contract." 4 Dunnell, Dig. (3 ed.) § 1817.

■ In Leslie v. Minneapolis Teachers Retirement Fund Assn. 218 Minn. 369, 373, 16 N. W. (2d) 313, 315, this court said:

"The rule is well established that ordinarily the construction of a writing which is unambiguous is for the court, particularly when the intention of the parties is to be gained wholly from the writing. However, if the language is ambiguous, resort may be had to extrinsic evidence, and construction then becomes a question of fact, unless such evidence is conclusive."

■ As was said by Mr. Justice Olson in Meiners v. Kennedy, 221 Minn. 6, 9, 20 N. W. (2d) 539, 540:

"We do not intend, nor is it within our province, to go into an extended discussion of the evidence to prove or demonstrate the correctness of the findings of the trial court. Rather, our duty is fully performed when we have fairly considered all the evidence and from it have determined that it reasonably supports the findings. The question is 'not that the trial court would not have been justified in making findings thereon in appellant's favor, but that the findings made are supported by evidence reasonably tending to establish the facts found.'"

See, Service & Security, Inc. v. St. Paul F. S. & L. Assn. 211 Minn. 199, 203, 300 N. W. 811, 813; Maust v. Maust, 222 Minn. 135, 23 N. W. (2d) 537.

■ A rule applicable to the situation presented here is that instruments executed at the same time, for the same purpose, and in the course of the same transaction are, in the eyes of the law, one instrument and will be read and construed together unless the parties stipulate otherwise. Where several instruments are made part of one transaction, they will be read together and each will be construed with reference to the others, although the instruments do not in terms refer to each other. 4 Dunnell, Dig. (3 ed.) § 1831.

■ Another well-established rule of construction is stated in 17 Am. Jur. (2d) Contracts, § 246:

"In construing or interpreting contracts and ascertaining the intention of the parties thereto, the contracts are to be considered in the frame of reference of their subject matter, their nature, and their object or purpose. The spirit and purpose of a contract, as well as its letter, must be regarded in the construction and effectuation thereof, and there can be no doubt that the court may look beyond the form into which the parties have cast their agreement. In fact it is the substance of an agreement rather than its form—the spirit and purpose rather than the letter—which must control its construction. The subject matter and the purpose of the contract are material to the ascertainment of the intention of the parties and the meaning of the terms they used, and when these are ascertained, they must prevail over the dry words of the agreement. If the general purpose of a contract is ascertained, the language of its provisions must be construed with reference to that purpose and so as to subserve it. It is always of much importance in the construction of a contract upon which doubt arises to ascertain what was the attitude of the parties to the subject and to find out what was their main purpose and object in making it. If this can be done, the terms of the contract will be so construed as to promote the main purpose, if the language employed will fairly permit such construction. This statement necessarily implies that explicit and positive language importing a different purpose cannot be overruled, but must be given its obvious meaning."

■ Since all instruments in question here were prepared by defendant, all doubts or ambiguities must be resolved against defendant. 4 Dunnell, Dig. (3 ed.) § 1832. In Weum v. Mutual Benefit Health & Acc. Assn. 237 Minn. 89, 104, 54 N. W. (2d) 20, 29, Mr. Justice Magney, speaking for this court, said:

"Where one of the parties draws a contract and the other must accept or reject but cannot vary the terms, the burden is upon the party drawing the contract to make the meaning plain. Where meaning is thus uncertain, as it is in the contracts here involved, the ambiguities and doubts must be resolved against the party who prepared the contract."

116

■ Defendant urges that plaintiff is not entitled to reformation of the contract, citing 16 Dunnell, Dig. (3 ed.) § 8328, which states:

"There are two classes of cases in which a written instrument may be reformed: (1) where there is a mutual mistake of the parties and (2) where there is a mistake on the part of one of the parties and fraud or other inequitable conduct on the part of the other party."

Reformation will not be ordered in the absence of clear and convincing evidence. The record here contains such evidence in the large body of evidence taken from defendant's own files.

While defendant denies that it breached the employment contract, the finding that the contract did contain a fixed progression, as plaintiff contended, requires the conclusion that the special treatment accorded Drs. Strobel and Swenson were breaches of the contract. It is clear that the actual practice of defendant under the progression system bears out the construction of this contract advocated by plaintiff and found by the court and jury. The record indicates that from the time the progression system became effective July 1, 1959, until January 1964, when Dr. Strobel was given the accelerated progression of which plaintiff complains in this action, no one progressed faster than was provided in the automatic progression plan which had been adopted by the partnership and the successor professional corporation.

■ Plaintiff argues that since the breaches were material, rescission was warranted, citing 4 Dunnell, Dig. (3 ed.) § 1808; Liebsch v. Abbott, 265 Minn. 447, 122 N. W. (2d) 578; and 17 Am. Jur. (2d) Contracts, § 504, which contains the following statement:

"To justify rescission of a contract, the amount of damage is immaterial, provided it is substantial. If the injury caused by breach of the contract in one or more of its essential parts is irreparable, or if the damages which might have been awarded would be difficult or impossible to determine or inadequate, the injured party may resort to the remedy of rescission."

In the Liebsch case this court made it plain that where one party to a contract refuses to perform a substantial part of the contract the other party may rescind it; and that if plaintiff rescinds the contract for justi-

fiable cause defendant cannot undo such rescission. It was further held in the Liebsch case that rescission annihilates the contract and, after a binding election to rescind, each party is returned to his previously existing rights. We said also that the intent necessary to a rescission of a contract, either by mutual consent of the parties, or by one party for legal cause, may be inferred from conduct. We further said (265 Minn. 447, 122 N. W. [2d] 579):

"All that is required to justify a rescission by the court is that the contract is one that a court of equity will cancel or rescind on the ground alleged, that such ground of rescission exists, and that the plaintiff has not lost his right to a rescission by affirmance, laches, or otherwise."

■ The trial court correctly charged the jury on the subject of waiver and ratification, as follows:

"* * * To establish waiver, it must be shown that the party charged therewith knew of his legal right and intended to relinquish or give it up. The intent to [waive], which involves an operation of the mind, must be clearly established as a fact. To establish such intent, relevant actions and statements of the individual concerned may be considered as having a direct bearing thereon."

See, Local 1142 v. United Electrical Workers, 247 Minn. 71, 76 N. W. (2d) 481; 20 Dunnell, Dig. (3 ed.) § 10135d.

Defendant contends that plaintiff is estopped to assert any breaches of contract on its part because plaintiff accepted an advance in pay. Defendant's argument completely ignores the fact that plaintiff had accepted this variation upon the strength of promises that a uniform progression system would be restored and he would receive a new written contract making the increase permanent. We fail to see where the claimed elements of equitable estoppel exist in the instant case and hold that plaintiff was entitled to rescission.

Since rescission of the contract makes the restrictive covenant unenforceable, we are not required to pass on whether defendant would be barred from enforcing it by the equitable maxim requiring one seeking an equitable remedy to "come into equity with clean hands." See, 27 Am. Jur. (2d) Equity, § 137; 6 Dunnell, Dig. (3 ed.) § 3142.

■ Defendant contends that the trial court improperly permitted plaintiff to cross-examine defendant's doctor members pursuant to Rule 43.02, Rules of Civil Procedure. This rule provides in part:

"* * * A party may call an adverse party or his managing agent or employe * * * and interrogate him by leading questions * * *."

The authors' comments in 2 Youngquist & Blacik, Minnesota Rules Practice, p. 397, indicate that Rule 43.02 is patterned upon Federal Rule 43(b), but that several changes were made to enlarge the scope of the rule and to clarify the language. The scope of the rule is explained therein as follows:

"* * * [T]he rule was expanded as to an individual party by including his managing agent or employee, and as to a corporation, partnership, or association by including employees as well as officers, directors, and managing agents, and it was made applicable to the state or any political subdivision or body politic."

Clearly this rule liberalized the former practice in calling an adverse party for cross-examination.

All of the physicians called were doctor members of defendant as opposed to probationary employees. Dr. Eustermann had been a member of the board of directors and did a great deal of the recruiting for defendant. If it were still a partnership, surely any full-time member physician could be called for adverse examination. Defendant cites Alsleben v. Oliver Corp. 254 Minn. 197, 94 N. W. (2d) 354, and Hemze v. County of Renville, 255 Minn. 115, 95 N. W. (2d) 596. Neither of those cases holds that employees may not be so called. Rule 43.02 was preceded by Minn. St. 1949, § 595.03. Prior to L. 1949, c. 503, that section read:

"A party to the record of any civil action * * * or the directors, officers, superintendent, or managing agents of any corporation which is a party to the record, may be examined by the adverse party as if under cross-examination * * *."

Chapter 503 amended the statute to read:

"A party to the record of any civil action * * * or the directors, officers, superintendent, or managing agents, or any appointive or elective official, or agent or employee having knowledge as to the matter in controversy, of any corporation * * * which is a party to the record, may be examined by the adverse party as if under cross-examination * * *."

When Rule 43.02 was adopted, the words "having knowledge as to the matter in controversy" were dropped. Clearly the class of persons who may be called under the rule is quite broad. The trial court properly permitted plaintiff's counsel to cross-examine defendant's members pursuant to this rule. Moreover, an examination of the record involving the testimony in question does not indicate any prejudice resulting therefrom.

Considering the record as a whole, we find ample evidence to sustain the findings of the trial court with respect to the meaning of the contract and the intention of the parties. The evidence supports the conclusion that plaintiff's stepped-up progression was temporary and that his acceptance of it was predicated upon a promise that a general revision of the whole method of compensation was to be undertaken. Since the contract was breached by defendant, the breaches were material, and plaintiff did not waive them, he was entitled to rescind the contract and thus terminate their relationship. The contract being unenforceable, the restrictive covenant is also unenforceable.

Affirmed.

MR. JUSTICE SHERAN took no part in the consideration or decision of this case.