MTS COMPANY, Appellant,

v.

TAIGA CORPORATION, Respondent.

No. C3-84-1538.

Court of Appeals of Minnesota.

April 2, 1985.

Review Denied June 14, 1985.

Robert Lewis Barrows, Leonard, Street & Deinard, Minneapolis, for appellant.

Robert W. Gislason, James T. Martin, Edina, for respondent.

Heard, considered and decided by LANSING, P.J., and FORSBERG and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Plaintiff MTS Company brought this action against defendant Taiga Corporation to declare the parties' rights under a sublease and other related agreements. After a trial before the court, the trial court held that the agreements entitled Taiga to sell alcoholic beverages in its restaurant and declared that Taiga was not obligated to pay additional rent for that privilege. The trial court further held that MTS was equitably estopped from claiming the agreements did not permit Taiga to sell alcoholic beverages. Judgment was entered and MTS filed notice of appeal. We affirm.

## FACTS

The parties dispute whether Taiga Corporation has a right to sell alcoholic beverages in the premises it rents from MTS Company. Taiga advances several theories supporting its claim that it may sell alcoholic beverages, including a theory that the sublease and related agreements provide that right, and a theory that MTS is estopped from opposing the sale of alcoholic beverages.

*The leases and related agreements*

In early 1977 MTS was renovating old warehouse buildings for a shopping and dining complex to be known as St. Anthony Main. MTS suggested to Reiko Weston, a Minneapolis restauranteur, that she open a

first class Oriental restaurant in the basement of one of those buildings. Following several months of negotiations, the parties formulated a three tier leasing arrangement in which MTS leased space to Egbert Souse and Associates, Inc., a/k/a Egbert Souse, a corporation held by an officer of MTS.[1] Egbert Souse in turn subleased part of its space to Taiga Corporation, an entity Weston formed to operate the new Taiga Restaurant. Four documents all executed October 12, 1977 describe the leasing arrangement.

In a document called the prime lease MTS rented the basement space to Egbert Souse for the specified purpose of operating an Oriental restaurant and a bar and cocktail lounge. Egbert Souse agreed to pay $7.69 per square foot for the space, subject to consumer price index adjustments, percentage rent, common operating expenses and 23% of the real estate taxes on the warehouse building. The prime lease term ran for ten years and thirty days, with three five year renewal options.

In a sublease Egbert Souse in turn sublet most of the basement space to Taiga. The sublease restricted Taiga's use of the space to the operation of a restaurant selling Oriental food and non-alcoholic beverages. Taiga agreed to pay $2.00 per square foot plus 17.24% of the real estate taxes. The sublease did not obligate Taiga to pay percentage rent, common operating expenses, or consumer price index adjustments. The sublease term was ten years, with three five year renewal options.

Egbert Souse and Taiga also executed a document entitled a restaurant agreement. In the document Egbert Souse agreed to sell alcoholic beverages within the Taiga Restaurant and to provide personnel for that purpose. Taiga agreed to allow the sale of alcoholic beverages and to allow Egbert Souse personnel to enter its restaurant. The restaurant agreement specifically incorporated the sublease by reference. The sublease did not explicitly "incorpo-

rate" the restaurant agreement but provides: "Entire Agreement. This lease and the Restaurant Agreement of even date herewith represent the entire agreement between the parties hereto, and there are no agreements, understandings or undertakings except as set forth herein."

The fourth document executed October 12, 1977 was a non-disturbance agreement between MTS and Taiga. The agreement is contained in a letter from MTS to Taiga describing terms the parties anticipated would be formalized in a later agreement. Although the anticipated agreement was never formed, the parties agree the terms described in the letter are binding. The letter provides in part:

> In the event our [MTS's] prime lease to Egbert Souse and Associates, Inc. is cancelled, or we otherwise reacquire control of said space, we will recognize the tenancy of your Company, without interference or disturbance, for so long as you are not in default under your Sublease. The provision to be included in the [anticipated] agreement shall be in substantially the following form:
>
> [MTS] covenants and agrees that in the event the [prime] lease shall be cancelled or Mortgagor shall in any manner reacquire the interest of the Tenant, * * * the Subtenant's possession of the Premises and the Subtenant's rights and privileges under the Sublease, * * * shall not be diminished or interfered with by [MTS] and Subtenant's occupancy of the Premises shall not be disturbed by [MTS] for any reason whatsoever during the term of the Sublease * * *

*Performance and breach*

The Taiga Restaurant opened for business in fall 1978. Egbert Souse sold alcoholic beverages in the Taiga Restaurant until April 1983 when it voluntarily filed a petition for bankruptcy and ceased business. The bankruptcy trustee later rejected Egbert Souse's obligations under both

---

1. As explained *infra*, Weston could not obtain a liquor license for the Taiga Restaurant under then existing law. Egbert Souse held a liquor license and could provide the needed alcoholic beverage service to the Taiga Restaurant.

the prime lease and the sublease. As provided in the non-disturbance agreement MTS "stepped down" to take Egbert Souse's position as sublessor under the sublease. MTS, however, did not assume Egbert Souse's obligations under the restaurant agreement, including alcoholic beverage service. After losing alcoholic beverage service Reiko Weston sought a liquor license in January 1984. The Taiga began selling alcoholic beverages in February 1984.

Claiming that Taiga's sale of alcoholic beverages violated the sole permitted uses clause in the sublease, MTS started an unlawful detainer action against Taiga. The unlawful detainer action was stayed when MTS brought this declaratory judgment action to establish whether Taiga' has the right to sell alcoholic beverages.

At trial MTS argued that the sole permitted uses clause in the sublease was clearly prohibited by the sale of alcohol. Because the sublease was unambiguous on that point, MTS contended no parol evidence was admissible to explain the terms. Taiga argued several theories. First it contended that the sublease and the restaurant agreement by their terms allowed Taiga to sell alcohol in the event of Egbert Souse's default. Alternatively they contended that the sublease and restaurant agreement formed one indivisible agreement which MTS was bound to honor under the non-disturbance agreement. To the extent that the agreement was unclear or ambiguous on that obligation, Taiga contended parol evidence clearly established the parties' intent that Egbert Souse's successor also serve alcoholic beverages. Because MTS breached its duty to serve alcoholic beverages, Taiga claimed MTS was estopped from raising Taiga's sale of alcohol to establish a breach of the sublease.

## Parol Evidence

The trial court allowed Taiga to present parol evidence on the negotiations between MTS, Taiga and Egbert Souse. In the spring of 1977 when MTS first contacted Reiko Weston about opening a restaurant in St. Anthony Main she held a liquor license for her Fuji-Ya Restaurant. Under then existing state and city law, she could hold only one liquor license in any one municipality. All parties agreed that alcoholic beverages were essential for the success of a first class Oriental restaurant and that they could not go ahead without it.

MTS proposed a method to bypass the legal barrier. Louis Zelle, a principal stockholder and chairman of MTS's parent company, the Jefferson Company, controlled a liquor license through his personally owned company, Egbert Souse & Associates, Inc.[2] Egbert Souse offered to lease the premises from MTS for the minimum rent required in MTS's financing arrangements, $7.69 per square foot plus added costs. In turn it agreed to sublease most of the premises to Taiga at $2.00 per square foot plus added costs, reserving the right to serve alcoholic beverages to Taiga's patrons.

This arrangement satisfied two of Weston's requirements for her restaurant. It provided affordable rental payments and alcoholic beverage service for the restaurant. The parties executed four documents describing their agreement on October 12, 1984. To satisfy liquor licensing officials that Weston was not operating another bar, the parties placed the sole permitted uses clause in the sublease.

Taiga spent approximately $400,000 renovating the warehouse basement and converting it into a restaurant. Sometime after the restaurant opened in the fall of 1978, the laws limiting Reiko Weston to one liquor license were repealed. Weston,

---

**2.** Taiga presented evidence supporting its theory that both MTS and Egbert Souse were the "alter egos" of Louis Zelle. The evidence included common management personnel in MTS, Egbert Souse, St. Anthony Main and The Jefferson Company, and their use of the same business offices. Taiga claimed that the court should disregard the separate corporate identities of Egbert Souse and MTS, treating them as one entity. Because we affirm on other grounds we need not reach this contention.

however, did not seek to acquire a liquor license until January 1984.[3]

### The trial court's decision

Viewing the sublease and restaurant agreement as entire and indivisible, the trial court held that the sublease and the restaurant agreement together gave Taiga the right to sell alcoholic beverages. It also held that MTS was estopped by its conduct and representations from claiming that Taiga does not have that right.

### ISSUES

1. Are the terms of the non-disturbance agreement, the sublease, and the restaurant agreement ambiguous, justifying the admission of parol and extrinsic evidence on the parties' intent?

2. Did the trial court err by interpreting the agreements to obligate MTS to honor Egbert Souse's duty to provide alcoholic beverage service in the Taiga Restaurant in the event of Egbert Souse's demise?

3. Is MTS prevented by its breach of the restaurant agreement from asserting a clause in the sublease prohibiting Taiga from selling alcoholic beverages?

### ANALYSIS

The source of MTS's obligation to Taiga is the non-disturbance agreement; it is the only agreement directly between MTS and Taiga. The language in the non-disturbance agreement is quite clear: MTS agrees to step down to the sublessor's position in the sublease upon Egbert Souse's default, in effect transforming the sublease into a prime lease. Upon assuming Egbert Souse's position as sublessor, the sublease defines the extent of MTS's responsibility.

### 1. Admissibility of Parol Evidence

MTS contends that the sublease clause on permitted uses clearly prohibits Taiga

from selling alcoholic beverages; therefore no ambiguity exists which needs explanation through parol evidence. Taiga contends that the sublease and restaurant agreement are ambiguous both in addressing Taiga's right to sell alcohol, and MTS's duty to sell alcohol.

■ When contract terms are clear and the contract is complete, parol and extrinsic evidence may not be admitted to show an ambiguity. *Hield v. Thyberg,* 347 N.W.2d 503, 507 (Minn.1984). Only if the contract is ambiguous or incomplete may parol evidence be admitted to show the parties' intent. *Flynn v. Sawyer,* 272 N.W.2d 904, 908 (Minn.1978).

### Taiga's right to sell alcoholic beverages

■ The sole permitted uses clause in the sublease lists several permitted uses. The sale of alcoholic beverages is not among those uses. It is clear the parties intended that list to contain the only permitted uses. Taiga does not identify any other language in the sublease, the non-disturbance agreement or even the restaurant agreement which suggests Taiga has a right to sell alcoholic beverages. Therefore, we find the documents address that point unambiguously.

### MTS's duty to sell alcoholic beverages

Even though it was not granted a "right" to sell alcoholic beverages, Taiga claims MTS breached a duty to sell alcoholic beverages. Thus Taiga claims that MTS can not assert Taiga's breach of the restrictive use clause. In its answer Taiga claimed the non-disturbance agreement bound MTS to perform Egbert Souse's obligations under the restaurant agreement, including selling alcoholic beverages to Taiga's patrons. At trial Taiga argued that the sublease and the restaurant agreement formed one entire and indivisible agree-

---

**3.** MTS, Egbert Souse and Taiga formed a supplementary agreement in November 1978 when lawmakers had proposed repealing the laws which prohibited Reiko Weston from obtaining a second liquor license. The supplementary agreement granted Taiga the option to "step up"

to Egbert Souse's position under the prime lease, and to sell alcoholic beverages. The parties agree this agreement does not apply to this controversy since Taiga never exercised its option.

ment, so that when MTS agreed to assume Egbert Souse's position under the sublease, it necessarily agreed to assume the obligations under the restaurant agreement as well. MTS objected, arguing that the non-disturbance agreement unambiguously shows it only agreed to assume Egbert Souse's obligations under the sublease.

The non-disturbance agreement as documented in the October 12, 1977 letter from MTS's attorney refers only to the sublease. The sublease, however, refers to the restaurant agreement: "ENTIRE AGREEMENT. This lease and the Restaurant Agreement of even date herewith represents [sic] the entire agreement. * * * " MTS contends this language plainly fails to incorporate the terms of the restaurant agreement, and thus no ambiguity can exist to admit parol evidence as to its meaning.

■ Although the "entire agreement" clause can be read simply as an integration clause, reasonable persons may easily attribute a different meaning to it. Many authorities including this court have interpreted the word entire to mean indivisible. *Autrey v. Trkla,* 350 N.W.2d 409, 413 (Minn. Ct.App.1984); *Jones v. Gregg,* 226 Ark. 595, 293 S.W.2d 545, 550 (1956); *Bronx County Appliance Corp. v. Brecher,* 113 N.Y.S.2d 622, 625 (Mun.Ct.1952). *See generally,* 17 Am Jur 2d, *Contracts* § 324 (1964); 30 C.J.S. *Entire* (1965); Black's Law Dictionary 477 (5th Ed.1979). If the parties intended this meaning, then arguably they intended the restaurant agreement to be a part of the sublease which MTS agreed to recognize in the non-disturbance agreement.[4] Since this ambiguity bears directly on Taiga's claim that MTS had a duty to serve alcoholic beverages, the trial court properly admitted and considered parol evidence when interpreting the written documents.

---

**4.** Even if the word "entire" is not ambiguous, the parties' execution of the agreements at the same time, in the course of the same leasing transaction and for the same purpose suggests that the agreements are intended to be read together. *Marso v. Mankato Clinic, Ltd.,* 278

### 2. MTS has a duty to serve alcoholic beverages

■ The parol evidence substantially supported the trial court's finding that Taiga and Egbert Souse intended the agreements to be indivisible. Testimony by witnesses from Taiga, Egbert Souse and MTS showed that the availability of alcoholic beverages was an essential condition in the leasing arrangement. Without that service Taiga would not have leased the premises, nor would it have expended $400,000 to renovate the basement. Therefore the trial court's finding that the agreements were not separate and divisible is not erroneous.

■ It readily follows that when MTS agreed to honor Egbert Souse's obligations under the sublease, it implicitly agreed to honor Egbert Souse's obligations under the restaurant agreement as well. This conclusion is supported by Reiko Weston's testimony that during lease negotiations in August 1977 MTS assured continuous alcoholic beverage service.

### 3. Taiga's remedy for MTS's breach

■ The trial court held that MTS was estopped by its own conduct, promises and representations from enforcing the restrictive uses clause in the sublease against Taiga. Its reliance on *Nelson v. Smith,* 349 N.W.2d 849 (Minn.Ct.App.1984) indicates it applied the equitable estoppel theory. One of the elements of equitable estoppel is "conduct—acts, language, or silence—amounting to a representation or concealment of material facts." *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 285, 230 N.W.2d 588, 594 (1975), *quoting from* 3 Pomeroy, Equity Jurisprudence (5 ed.), § 805. Taiga does not point to any factual representations by MTS upon which it relied because Taiga actually relied upon MTS's promise in the non-disturbance agreement.

---

Minn. 104, 114–15, 153 N.W.2d 281, 288–89 (1967). Parol evidence on the circumstances of execution is admissible to assist in interpreting the agreements. *Anderson v. Kammeier,* 262 N.W.2d 366, 370, n. 2 (Minn.1977).

 Promises may also form the basis for estoppel. *Id.* Promissory estoppel, however, is not an appropriate theory when the parties have executed a written contract as they have here. *See Lunning v. Land O'Lakes,* 303 N.W.2d 452 (Minn. 1980).

 MTS asks that we declare that Taiga has breached the restrictive use clause in the sublease thus creating a legal basis for MTS's unlawful detainer action. The discussion above shows, however, that MTS breached a part of its obligation before Taiga allegedly breached the sublease. A rule in the law of contracts is that a party cannot raise to its advantage a breach of contract against another party when it has first breached the contract itself. *Cheezem Development Corp. v. Intracoastal Sales and Service, Inc.,* 336 So.2d. 1210, 1212 (Fla.Ct.App.1976); *Yonan v. Oak Park Federal Savings and Loan Association,* 326 N.E.2d 773, 781 (Ill.App. 1975); *Robinhorne Construction Corp. v. Snyder,* 251 N.E.2d 641, 645–46 (Ill.App. 1969), *aff'd,* 265 N.E.2d 670 (Ill.1970). *Cf. Verran v. Blacklock,* 60 Mich.App. 763, 231 N.W.2d 544, 547 (1975); *Odysseys Unlimited, Inc. v. Astral Travel Service,* 77 Misc.2d 502, 354 N.Y.S.2d 88, 91 (Sup.Ct. 1974). While this rule should not apply in every case to prevent the initial breaching party from seeking a remedy for another party's subsequent breach, in this case the rule has particular force. First, at the time MTS brought and tried this action it was still breaching the restaurant agreement. Second, Taiga's decision to sell alcoholic beverages directly resulted from MTS's initial breach of the agreements. In effect, Taiga simply supplied an essential service for its business which MTS had promised, but failed, to provide. To declare Taiga in breach of the contract under those circumstances, thus clearing the path for Taiga's removal from the premises, is an inequitable result. We hold that MTS may not enforce the restrictive use clause under the circumstances of this case.

**DECISION**

The trial court properly admitted parol evidence on the parties' intent that the sublease and restaurant agreement form one indivisible agreement. Because the evidence established the intent to form one indivisible agreement, MTS's non-disturbance agreement obligated it to fulfill Egbert Souse's obligations under both the sublease and the restaurant agreement. Although equitable and promissory estoppel do not apply, principles of contract law and equity prohibit MTS from objecting to Taiga's sale of alcoholic beverages.

Affirmed.