Robert CLAPP, et al., Appellants,

v.

HAFERMAN WATER CONDITIONING, INC., and Kinnetico, Inc., Respondents.

No. C1–85–849.

Court of Appeals of Minnesota.

Jan. 28, 1986.

Darrel A. Baska, Eagan, for appellants.

James T. Martin, Edina, for Haferman Water Conditioning, Inc.

Thomas L. Grundhoefer, South St. Paul, for Kinnetico, Inc.

Heard, considered and decided by PARKER, P.J., and FORSBERG and NIERENGARTEN, JJ.

## OPINION

NIERENGARTEN, Judge.

Robert and Kathryn Clapp appeal from a judgment setting aside a partial jury verdict and directing verdicts in favor of Haferman Water Conditioning, Inc. and Kinetico, Inc. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## FACTS

Robert and Kathryn Clapp requested Haferman Water Conditioning, Inc. to inspect the water conditioning equipment at their new home. After inspection, Larry Haferman concluded that the existing water conditioning equipment was not functioning properly because the water contained an iron level of 20 parts per million, (20 ppm) whereas an average iron level would be 2–3 ppm.

Clapps claim Haferman assured them that he could reduce the iron level to below .3 ppm, and recommended that they purchase a Landomatic dry-pellet chlorinator, a Kinetico iron filter, and a Kinetico water conditioner (water softener). Haferman denies giving such assurances. Clapps investigated the equipment, reviewed the Kinetico lifetime limited warranty, and read promotional brochures for the Landomatic chlorinator and Kinetico water conditioner. The literature for the conditioner promised "clean, soft water every hour of the day, every day of the year." Based on Haferman's representations, the sales literature, and Haferman's assurances that the equipment would be maintenance free, the Clapps purchased a Kinetico water conditioner, a Kinetico iron filter, and a Landomatic chlorinator from Haferman on December 9, 1981.

After the installation of the equipment, the Clapps complained of "hard, smelly water" that produced rust stains on the fixtures in the house. Haferman informed the Clapps that this was normal, and adjusted the equipment.

The water later became good and soft, but there was some staining of the water fixtures in the house that required cleaning every five weeks. At this time, the iron level was .5 ppm.

In early January 1982, problems developed with the dry-pellet chlorinator and Haferman and his employees made numerous visits to the Clapps' home in an attempt to correct the problem, which was not actually resolved until May 1983.

Even then, problems with the iron content of the water was a constant source of trouble for the Clapps, causing the water to turn a rusty, brown color. Haferman refused to service the equipment after June 15, 1983.

In July 1983 the Clapps contacted a representative of Kinetico, Inc. regarding the water problems they were experiencing. The Kinetico representative recommended that the Clapps replace the berm in the iron filter because the berm was likely clogged with iron as a result of the malfunctioning of the chlorinator. Clapp never replaced the berm. At one point during the summer, the iron level in the Clapps' water was 8.7 ppm.

Clapps filed suit against Haferman in October 1983, and on November 7, 1983, the parties executed a settlement agreement, pursuant to which Haferman agreed to change the berm and install some new parts at no cost to the Clapps as well as pay them $304.04. The agreement further provided as follows:

> [Haferman] agrees to monitor and test [Clapps'] water once per week for a period of 60 days, commencing upon completion of said work. In the event that during this 60 day period, *the test results indicate [Clapps'] water to be non-potable*, [Haferman] agrees to service [Clapps'] water conditioning system. Service to include replacement parts and labor necessary to maintain above equipment in factory operating condition * *.

(emphasis added). Robert Clapp testified at trial that as of November 7, 1983, the chlorinator was functioning properly and that Haferman properly installed the Kinetico equipment.

The monitoring period was extended to January 18, 1984, and test results showed an iron level ranging from .5 ppm to 4 or 5 ppm. The chlorine residual of the water was never tested within the range of tolerance. The condition of the water continued to deteriorate, and in February 1984 "the water had reached the point where Mr. Clapp feared for the health of his family." The Clapps removed the Kinetico equipment, and filed suit against Haferman and Kinetico in August of 1984.

At trial the Clapps premised their lawsuit on a claim that their water was not potable during the monitoring period, thus constituting a breach of the settlement agreement, that Haferman and Kinetico breached express and implied warranties, and that they had properly revoked acceptance. At the close of testimony, both Haferman and Kinetico moved for directed verdicts. The trial court took the motions under advisement, and submitted factual matters to the jury in the form of a special verdict. The jury failed to respond to one special verdict interrogatory regarding whether Haferman breached the settlement agreement. The jury found that Haferman breached implied and express warranties causing direct harm to the Clapps. The jury also found that Haferman's negligence was a direct cause of harm, and that the Clapps were not negligent and had properly revoked their acceptance. Finding Haferman to be 80% at fault and Kinetico 20% at fault, the jury awarded the Clapps $6,000, $5,000 of which was for incidental and consequential damages.

The Clapps moved for judgment in their favor notwithstanding that the jury failed to answer whether Haferman breached the settlement agreement and was discharged or, in the alternative, for a new trial. The trial court entered directed verdicts in favor of Haferman and Kinetico. The Clapps appeal the judgment entered on March 25, 1985.

## ISSUES

1. Did Haferman breach the settlement agreement?

2. Did Kinetico breach any express or implied warranties?

3. Are Clapps entitled to a statutory award of attorney's fees?

## ANALYSIS

### Standard of Review

 "A motion for a directed verdict presents a question of law regarding the sufficiency of the evidence to raise a fact question for the jury's decision." *Midland National Bank of Minneapolis v. Perranoski,* 299 N.W.2d 404, 409 (Minn.1980). In considering such a motion, the trial court is to consider the entire record and treat as credible the evidence for the adverse party and all reasonable inferences from that evidence. *Id.* "The trial court should grant the motion only when it would clearly be its duty to set aside a contrary verdict as manifestly against the evidence or when such a verdict would not comply with the applicable law." *Id.* (citation omitted). On review of a trial court's decision, the same standard governs. *Id.*

### I

The Clapps' first claim is that Haferman breached the settlement agreement because it (1) failed "to service the equipment in a manner sufficient to provide potable water during the monitoring period" and (2) failed "to service the equipment in a manner * * * sufficient to maintain the equipment in factory operating condition." Whether Haferman breached the settlement agreement is dispositive of the issue of express or implied warranties raised against Haferman.

The Clapps contend that water with an iron level in excess of .3 ppm is not potable. Their expert defined potable as "water that does not contain objectionable pollutants, contamination, mineral or infectious agents and is considered safe for domestic consumption." He considered the term "potable" to be synonymous with palatable. At

oral argument, counsel for the Clapps defined palatable in terms of how the water looks, arguing that the Clapps' water was so discolored that an individual would not want to drink it.

Haferman introduced evidence at trial defining potable as "non-injurious to human health." There was no evidence introduced as to possible injurious effects in drinking the water.

 What was meant by the term "non-potable" as used in the settlement agreement is decisive, for "[t]he fundamental approach to construing contracts is to allow the intent of the parties to prevail." *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979) (citations omitted). The court is to consider the "spirit and purpose of the contract, as well as its letter." *Beattie v. Product Design and Engineering, Inc.,* 293 Minn. 139, 147, 198 N.W.2d 139, 143 (1972) (quoting *Marso v. Mankato Clinic, Ltd.,* 278 Minn. 104, 153 N.W.2d 281 (1967)). According to the Clapps, "[t]he true intention of the parties and the central purpose of the settlement agreement was to reduce the unacceptably high iron content of [Clapps'] residential water. High iron content was [Clapps'] continual complaint."

On the other hand, Haferman argues that "[i]f the water was drinkable at all times (and it was), then Haferman fulfilled his obligations under the settlement." Haferman contends that the agreement contains no requirements concerning maximum iron levels, nor does it refer to palatability as the standard by which to measure the quality of the water.

Further contending that the settlement agreement was not ambiguous, Haferman claims the trial court erred in allowing parol evidence at trial to define non-potable. Haferman argues that the term "non-potable" must be given its ordinary and popular meaning, and that meaning is water not suitable for drinking. *Cf.* Black's Law Dictionary 1051 (5th ed. 1979) ("potable" is defined as "suitable for drinking" and "drinkable"). In the alternative, Haferman

argues that if some ambiguity exists, then it must be construed against the Clapps because their attorney drafted the settlement agreement. *See Turner*, 276 N.W.2d at 66.

"A contract is ambiguous if it is reasonably susceptible to more than one construction." *The Telex Corp. v. Data Products Corp.*, 271 Minn. 288, 291, 135 N.W.2d 681, 685 (1965) (quoting *Employers Liability Assurance Corp. v. Morse*, 261 Minn. 259, 263, 111 N.W.2d 620, 624 (1961)). Clapps argue that even if potable is defined as fit for human consumption, Haferman still breached the settlement agreement because Clapps' water had a chlorine content in excess of the level the owner's manual states should be maintained for human consumption. Clapps' expert never defined potable in terms of chlorine content and the owner's manual does not use the terms potable or non-potable.

The trial court gave the jury a special verdict, which contained a question specifically asking the jury whether Haferman breached the settlement agreement. Despite the vast amount of evidence and argument surrounding the issues of potability as referred to in the settlement agreement, the jury did not respond to the question.

We find that the evidence was sufficient to raise fact questions requiring the jury to answer the question of whether Haferman breached the agreement. The trial court erred in directing a verdict in favor of Haferman, and thus we reverse and remand for a new trial to require a jury to determine the intent of the parties in their use of the term "non-potable" and whether Haferman breached the settlement agreement.

## II

The Clapps argue that Kinetico breached oral and written affirmations of fact. If they are correct, Kinetico then can be found to have expressly warranted that the goods will conform to that affirmation or promise. *See* Minn.Stat. § 336.2–313 (1984).

The Clapps' contention is based on an alleged breach of representations made in Kinetico's sales brochure and the terms of its written lifetime limited warranty. According to the Clapps, the sales brochure promised soft and clean water and that Kinetico would aid its customers with all their "water quality problems." The Clapps argue that the iron filter never delivered clean water because it failed to maintain iron levels below .3 ppm. Moreover, Kinetico promised professional help, which Clapps argue they never received.

Kinetico claims there is no evidence establishing defective equipment because a high iron level is not indicative of a defect, and it never warranted that its equipment would produce iron levels below .3 ppm. According to Kinetico, many factors could result in a high iron level. Kinetico adds that with respect to the sales brochure, the Clapps had no basis to rely on its promise of clean water because it applied only to the water softener, not to the entire system.

The Clapps argue that, even without an express warranty, by operation of law, goods are warranted to be merchantable, that is, "fit for the ordinary purposes for which such goods are used." *See* Minn. Stat. § 336.2–314, subd. 2(c) (1984). According to the Clapps, the best evidence of a breach of implied warranty were the assurances by Kinetico that the equipment would produce clean and clear water and further evidence of an improper backwash cycle of the iron filter.

Kinetico argues the evidence established that many communities have water containing iron levels that exceed .3 ppm, and that the argument about improper backwash cycle is pure speculation.

This evidence contains nothing upon which a jury could base a breach of warranty. The test results showed a high iron level at a time when the Clapps failed to follow the Kinetico representative's recommendation that the berm in the iron filter be replaced. Furthermore, a high iron level alone is not enough to show that the equipment was defective. Finally, .3 ppm

is an arbitrary iron level that Kinetico never guaranteed. When the jury is left to speculate as to possible causes, a plaintiff does not sustain its burden. *See Nelson v. Wilkins Dodge, Inc.*, 256 N.W.2d 472, 478 (Minn.1977). We conclude that the trial court did not err in directing a verdict in favor of Kinetico on the issue of whether Kinetico breached any express or implied warranties.

### III

The Clapps argue that they are entitled to atttorney's fees under the Minnesota Consumer Protection Act and the Magnuson-Moss Warranty Act. Attorney's fees under these Acts are only recoverable upon a finding of breach of warranty. *See* 15 U.S.C.A. § 2310(d) (1982); Minn.Stat. § 8.31, subd. 3a (1984).

### DECISION

The record does not sustain the trial court's directed verdict in favor of Haferman Water Conditioning, Inc. Because the record is devoid of any evidence that the equipment was defective, the record does sustain the trial court's directed verdict in favor of Kinetico, Inc. The Clapps are not entitled to attorney's fees.

Affirmed in part, reversed in part, and remanded.