Lawrence C. DiPIETRO et al.

v.

David J. BOYNTON et al.

Supreme Judicial Court of Maine.

Argued June 17, 1993.
Decided July 20, 1993.

John S. Campbell (orally), Poulos & Campbell, P.A., Portland, for plaintiffs.

Paul K. Marshall (orally), Kingfield, for defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, RUDMAN and DANA, JJ.

GLASSMAN, Justice.

The defendant David J. Boynton appeals from the judgments entered in the Superior Court (Cumberland County, *Cole, J.*) on jury verdicts awarding compensatory and punitive damages to plaintiffs Jamestown Post and Beam, Inc. (Post) and Jamestown Lumber and Supply, Inc. (Lumber) on their claims against Boynton for breach of contract and conversion and compensatory damages to plaintiff Samson Construction Corp. (Samson) on its claim against Boynton for conversion. Post, Lumber, and Samson cross-appeal, challenging the court's order granting Paul K. Marshall's motion for a summary judgment on plaintiffs' breach of contract and fraud claims against Marshall and from the court's order granting Boynton's motion for a directed verdict in his favor on the plaintiffs' claim of fraud. DiPietro cross-appeals from the court's order granting Boynton's motion to vacate the judgment notwithstanding the jury's verdict awarding DiPietro punitive damages.[1] Finding no error in the record, we affirm the judgments.

Post, Lumber, and Samson were construction-related corporate businesses owned and operated by DiPietro. On May 4, 1984, Boynton contracted with DiPietro personally and with Post for the lease of Boynton's property containing a sawmill. At the same time, Boynton entered in a

---

1. Robert Walker and Paul K. Marshall, also named as parties defendants in this action, do not join in this appeal.

separate contract with Post giving it a one-year option to purchase the millsite for $60,000, providing that on payment of $6,000 to Boynton at the time of exercising the option, Boynton would transfer title to the premises. The balance of the purchase price would be seller financed through a promissory note for $54,000 secured by a mortgage on the premises. Lumber and Samson utilized the millsite along with Post in related businesses. On October 10, 1984, Post assigned its rights pursuant to the option agreement to Lumber. On January 21, 1985, Lumber attempted to exercise the option by sending a $6,000 check to Boynton with a letter expressing its readiness to execute the promissory note and mortgage pursuant to the agreement, seeking delivery of the millsite deed, and advising that payment of rent would be discontinued. Boynton cashed Lumber's check but did not respond to the letter. Lumber sent Boynton two more letters seeking to exercise the option before it lapsed, but Boynton did not respond.

In December 1985, Boynton instituted a suit against DiPietro and Post for their alleged breach of the lease agreement and was awarded minimal damages on December 8, 1987. On December 3, 1986, Boynton secured a writ of possession for the mill by a default judgment on a complaint for a forcible entry and detainer. In April 1987, Boynton removed the plaintiffs' equipment, inventory, and vehicles from the mill without notice to those parties.

The plaintiffs instituted the present action in December 1987. By their multi-count complaint, the plaintiffs sought, *inter alia*, damages from Boynton for his breach of the option contract, conversion of their property, and fraud, and from his attorney, Paul K. Marshall, for Marshall's collusion in the alleged breach of contract and fraud. After a hearing, the court granted Marshall's motion for a summary judgment on the plaintiffs' claims against him.

At the trial of this case and after the close of the plaintiffs' evidence, the court granted Boynton's motion for a directed verdict on the plaintiffs' fraud claim

against him. The jury returned verdicts in favor of the plaintiffs, awarding Post compensatory damages for the breach of contract and conversion in the respective amounts of $64,000 and $2,000; awarding Lumber compensatory damages for the breach of contract and conversion in the respective amounts of $56,000 and $1,000; and awarding Samson compensatory damages in the amount of $5,600 for conversion. In addition, Post, Lumber, and DiPietro were each awarded punitive damages in the amount of $10,000. The trial court granted Boynton's subsequent motion for a judgment notwithstanding the verdict and vacated the punitive damage award to DiPietro.

### 1. The Standing of Post and Lumber to Sue.

■ By his appeal, Boynton first contends that the trial court erred as a matter of law when it denied his motion to dismiss the claims of both Post and Lumber. He argues that because the Secretary of State had suspended Post on June 6, 1986 for its failure to appoint a clerk in accordance with 13-A M.R.S.A. § 308 (Supp.1992) and Lumber on November 12, 1986 for its failure to file an annual report for 1986 in accordance with 13-A M.R.S.A. § 1302 (1981 & Supp.1992), the corporations were without standing to institute the present action. The corporate powers of both entities, however, had been reinstated by the time the trial court ruled on Boynton's motion to dismiss.

"[W]here a corporation has cured its default, whether due to pressure caused by inability to proceed with a lawsuit or by inability to exercise some other corporate power, the purposes of the statute have been fulfilled and no further sanction is necessary." *Michigan Rural Dev., Inc. v. El Mac Hills Resort, Inc.*, 34 Mich.App. 505, 191 N.W.2d 733, 735 (Div. 1 1971) (holding that a corporation suspended for a failure to file an annual return "is entitled to proceed with a pending lawsuit if it cures its default at any time prior to actual dismissal of the suit"). Furthermore, when the state sanctions a corporation, it does

not aim in so doing to protect those who have committed torts against or breached contracts with that corporation. *See Hydrotech Systems v. Oasis Waterpark,* 52 Cal.3d 988, 277 Cal.Rptr. 517, 803 P.2d 370, 378 n. 8 (1991) ("The [fictitious-name] statute's purpose is not served by extending its protection to one who committed a tort against a fictitiously named business"). Dismissal of the claims of Post and Lumber after their corporate powers had been reinstated would have served no statutory purpose, and the trial court properly denied Boynton's motion.

### 2. The Inapplicability of Claim Preclusion.

Boynton next contends that the trial court erred in denying his motion for a summary judgment on the ground that the plaintiffs are barred from instituting the present action against him. He argues that pursuant to M.R.Civ.P. 13(a)(1) any claim plaintiffs had against him arising out of his alleged breach of the option contract had to be stated as a counterclaim in his December 1985 action against DiPietro and Post for their alleged breach of the lease agreement and the failure to do so precludes the plaintiffs' present action.

██ M.R.Civ.P. 13(a)(1) provides in pertinent part that

> a pleading shall state as a [compulsory] counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim....

Claim preclusion exists when the second claim arises out of the *same transaction* as the first, previously-litigated claim.

> What factual grouping constitutes a 'transaction' [is] to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Beegan v. Schmidt,* 451 A.2d 642, 645 (Me. 1982) (quoting *Restatement (Second) of Judgments* § 24 (1982)). Here, the breach of the lease complained of in Boynton's suit against DiPietro and Post is sufficiently separate in time and origin from the claimed breach of the option contract and conversion in the present action as to be considered a separate transaction. Accordingly, the trial court properly denied Boynton's motion for a summary judgment.

### 3. Boynton's Liability for Breach of the Option Contract.

Boynton further contends that the evidence is insufficient to support the finding that he breached the option contract. He first argues that it is DiPietro and Post, as opposed to himself, who should be liable for a breach of contract. He asserts that the lease and the option constituted a single agreement, as evidenced by their simultaneous execution and interrelated subject matter. Boynton asserts that this comprehensive agreement between the parties was first breached not by his failure to perform on the option, but rather by DiPietro's and Post's contravention of the terms of the lease.

██ "[W]here several instruments are made part of one transaction, they will be read together and each will be construed with reference to the others, although the instruments do not in terms refer to each other." *Business Credit Leasing, Inc. v. City of Biddeford,* 770 F.Supp. 35, 39 (D.Me.1991) (applying Minnesota law) (quoting *Marso v. Mankato Clinic, Ltd.,* 278 Minn. 104, 153 N.W.2d 281, 289 (1967)). The "question of whether the documents are ... made part of the same transaction and should be read together ... 'is governed by the intent of the parties manifested at the time of contracting and viewed in light of the surrounding circumstances.'" *Id.* at 39 (quoting *Farrell v. Johnson,* 442 N.W.2d 805, 807 (Minn.Ct.App.1989)). Here, the record discloses that the lease and the option were separate, distinct agreements. The lease was between Boynton and DiPietro and Post. The option was between Boynton and Post. Each agree-

ment was capable of independent enforcement. Neither the lease nor the option refer to the other agreement. Neither agreement contains an integration clause. At the time of the execution of the documents, Boynton assented to DiPietro's clearly expressed intention that the instruments be separate and distinct agreements.

■ Boynton's second challenge to his liability for a breach of the option contract rests on his assertion that his duty to perform under that contract did not arise. He first contends that because there was not a written assignment of the option contract, the assignment did not comply with the Statute of Frauds and was invalid. There is no prohibition of the assignment of option contracts for the purchase of land; they are subject to the general principles of assignability that govern all contractual rights. *Restatement (Second) of Contracts* § 320 (1981). The Statute of Frauds governs all "contract[s] for the sale of lands ... or of any interest in or concerning them." 33 M.R.S.A. § 51 (1988). Although the statute employs the expansive term "concerning" to define its own applicability, it does not apply to every contract in which land is involved. *See Dehahn v. Innes,* 356 A.2d 711, 718 (Me.1976) (statute of frauds inapplicable to an agreement in which the sale of land constituted only 5% of its total price). An option contract for the sale of land "is nothing more than an irrevocable and continuing offer to sell, and conveys no interest in land to the optionee, but vests in him only a right in personam to buy at his election. At best it is but an irrevocable right or privilege of purchase and does not come within" the statute of frauds. *Shaughnessy v. Eidsmo,* 222 Minn. 141, 23 N.W.2d 362, 365 (1946). *See also Richanbach v. Ruby,* 127 Or. 612, 271 P. 600, 604–05 (1928) (because option holder has no interest in the land, statute of frauds not applicable).

■ Boynton next contends that without notice to him the assignment of the option agreement is invalid. The validity of an assignment is not dependent on notice. Absent a statutory requirement to the contrary, notice to the debtor is not essential to the validity of an assignment, unless the debtor acted to his prejudice because of lack of notice or before receiving notice of the assignment. The main function served by notice to the debtor of an assignment of a claim against the debtor is the establishment of the priority of the assignment over subsequent assignments of the debtor's obligation by the assignor or subsequent garnishments by the creditors of the assignor.

*Grunloh v. Effingham Equity, Inc.,* 174 Ill.App.3d 508, 124 Ill.Dec. 140, 528 N.E.2d 1031, 1039 (4 Dist.1988). *See also* 6A C.J.S. *Assignments* § 89 at 742 (1975) (Enforcement of rights under an assignment not dependent on notice; rather, notice protects the assignee from "intervening rights and equities" which might arise, for example, if the debtor pays the assignor, or if the assignor forgives the debtor, before the debtor receives notice of the assignment.).

■ Boynton contends finally that because Lumber failed to notify him of the assignment he was relieved from any duty to perform in accordance with the option agreement. "Before the obligor has been notified of the assignment, he is justified in believing that his duty is still owed to his original obligee, the assignor." 4 *Corbin on Contracts* § 890 at 577 (1951). Proper notice consists of "notification of the assignment and ... notification reasonably identif[ying] the rights assigned." *Progressive Design, Inc. v. Olson Bros. Mfg. Co.,* 200 Neb. 291, 263 N.W.2d 465, 469 (1978). A party with "knowledge of facts sufficient to induce a prudent man to inquire in respect to other facts germane to the matter in hand, will be charged with knowledge of such other and further facts as he might have learned by reasonable diligence in prosecuting his inquiry in the right direction." 3 *Williston on Contracts* § 437 at 248 (3d ed.1960). Although in Lumber's communication with Boynton it did not specifically state that Post had assigned its option rights to Lumber, it is uncontradicted that Lumber precisely identified the assignment rights at issue. Lumber's first attempt to exercise the option

included the submission of a check for $6,000 and readiness to proceed with the further financing, as demanded by the terms of the option. Accordingly, the evidence discloses that Boynton was aware of facts that would have induced a prudent person to ascertain the existence of the assignment.

### 4. The Evidence Supporting the Damages Awards.

 Boynton challenges the sufficiency of the evidence to support the punitive damages awards. "[P]unitive damages are available based upon tortious conduct only if the defendant acted with malice." *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me.1985). Malice exists when defendant's tortious conduct is motivated by ill will toward the plaintiff and may be implied by outrageous conduct. *Id.* However, malice may not be established by the defendant's mere "reckless indifference to the rights of others." *Id.* at 1362 (quoting *Restatement (Second) of Torts* § 908 (1977)). Malice must be proven by clear and convincing evidence. *Id.* at 1362–63. The punitive damages awarded to Post and Lumber were founded on Boynton's conversion of their property. There is competent evidence in the record to support the jury's finding to a high degree of probability that Boynton, out of ill will toward Post and Lumber, directed the sale of their property without notice to them and knowing that they had not abandoned it.

Boynton also challenges the sufficiency of the evidence supporting the compensatory damages award for the breach of the option contract. He contends that the trial court erred in admitting the testimony of DiPietro concerning the value of the millsite. A witness testifying about the value of real property must be "qualified as an expert by knowledge, skill, experience, training, or education" about such matters. M.R.Evid. 702.

 There is no evidence in the record establishing DiPietro's expert status. DiPietro argues that as a corporate officer he is entitled to testify about the value of the millsite under the presumption that "a property owner is qualified to give an opinion as to the value of that property." *Stanley v. DeCesere*, 540 A.2d 767, 770 (Me.1988). There is a distinction, however, between the applicability of the presumption to personal as opposed to corporate owners of land. *See M.A. Realty Co. v. State Roads Comm'n*, 247 Md. 522, 233 A.2d 793, 795 (1967) (presumption is "limited to personal owners of property, and does not extend to the officers or stockholders of a corporation"). Furthermore, neither DiPietro nor his companies owned the millsite; they merely rented it. Consequently, the admission of DiPietro's testimony was an abuse of discretion.

 The erroneous admission of testimony in evidence, however, does not undermine the validity of a judgment if the error is harmless. M.R.Civ.P. 61. Damages for Boynton's breach of the option contract amount to the difference between the fair market value of the mill at the time of the breach and the unpaid contract price. Although damages must be grounded on "facts in evidence," they "need not be prove[n] to a mathematical certainty." *King v. King*, 507 A.2d 1057, 1059–60 (Me. 1986). The jury awarded a total of $120,000 in damages to Post and Lumber for the breach. The jury heard evidence that Post and Lumber had made a substantial investment in improvements on the property in the amount of $75,000 to $100,000. Boynton attempted to sell the property in May 1987 for $125,000, *after* he stripped the property of those improvements. Because there was competent evidence, exclusive of DiPietro's testimony, to support the jury's award of compensatory damages, we hold the admission in evidence of DiPietro's testimony as to the market value of the millsite was harmless error.

### 5. The Cross–Appeal.

 The plaintiffs first contend that the trial court erred in granting Marshall's motion for a summary judgment. A summary judgment will be vacated if the record reveals that a genuine issue as to material fact exists. *Carter v. Bangor Hydro–Elec. Co.*, 598 A.2d 739, 741 (Me.1991).

The trial court properly concluded that the plaintiffs failed to generate any issue that Marshall had not acted solely as an advocate for Boynton. *See Layman v. Layman*, 84 Md.App. 183, 578 A.2d 314, 316 (1990) (lawyer not liable to third parties for the performance of professional duties absent evidence of collusion).

 The plaintiffs also challenge the propriety of the trial court's directed verdict on their claim against Boynton for fraud. A directed verdict will be vacated only if competent evidence rationally could support a judgment for the losing party. *Reed v. A.C. McLoon & Co.*, 311 A.2d 548, 550 (Me.1973). The record in this case reflects that the trial court properly determined that the evidence produced by the plaintiffs was insufficient to support a finding by clear and convincing evidence that Boynton did not intend to perform the option contract at the time he entered into it. *See Diversified Foods, Inc. v. First Nat. Bank of Boston*, 605 A.2d 609, 615 (Me. 1992) (reciting the elements and the degree of proof required to prevail on an action for fraud).

Finally, DiPietro argues that the trial court erred in granting Boynton's motion for a judgment notwithstanding the verdict to set aside DiPietro's punitive damages award. Punitive damages, however, will lie only when the plaintiff receives compensatory or actual damages based on the defendant's tortious conduct. *Zanville v. Garza*, 561 A.2d 1000, 1001–02 (D.C.App. 1989). Here, the jury did not award DiPietro damages on his claim that Boynton had converted his property. Accordingly, the trial court properly determined that DiPietro was not entitled to a punitive damage award based on that claim.

The entry is:

Judgments affirmed.

All concurring.