STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC                                          CV-09-163
                                                 *MMM—KEN- 1/A/2001*

LEO BELANGER, et al

Plaintiffs

v.                                               FINDINGS AND JUDGMENT

JOHN MULHOLLAND

Defendant

## Background

This matter was tried before the court without a jury on September 21, 2010. Plaintiffs

Leo and Germaine Belanger are represented by Attorneys Judith Plano and Peter Bickerman of

Pine Tree Legal. Defendant John Mulholland is represented by Attorney Pasquale Perrino, Jr.

By Complaint dated May 27, 2009, Plaintiffs alleged the following causes of action:

Count I, Breach of Implied Warranty and Covenant of Habitability; Count II, Negligence; Count

III, Intentional Infliction of Emotional Distress; and Count IV, Negligent Infliction of Emotional

Distress. On August 27, 2010, the court granted leave to the Plaintiffs to file an Amended

Complaint which added Count III, alleging Wrongful Retention of Security Deposit, renumbered

Count IV as Intentional Infliction of Emotional Distress, renumbered Count V as Negligent

Infliction of Emotional Distress, and added Count VI, Punitive Damages.

The parties filed post-hearing memoranda, the last of which was received by the court

November 2, 2010. The court has reviewed the evidence and testimony, considered the

arguments of counsel, reviewed pertinent statutes and case law, and issues the following findings

and Judgment.

1

## FACTUAL BACKGROUND

In 1987 the Plaintiffs moved into a trailer then owned by Walter and Norinne Arnold. The trailer was manufactured in the late 1960s. In 2001, the Arnolds sold the mobile home park in which the trailer was located to the Defendant, John Mulholland. According to the Defendant, the only lease signed between him and the Plaintiffs was one signed September 11, 2006, which was admitted as Defendant's Exhibit 5. That lease expired by its own terms on August 31, 2007. The parties seem to agree that, prior to that lease, the parties' relationship was governed by the lease between the Plaintiffs and the prior owners dated July 11, 2001 (Def.'s Ex. 1). Defendant's Exhibit 6 indicates that the Plaintiffs received and signed on December 1, 2003 a document entitled "Brookdale Mobile Home Park Rules," which the Defendant testified were the rules that he instituted for all tenants when he purchased the park.

On August 8, 2006, the Defendant sent the Plaintiffs a mailing (Def.'s Ex. 4), which referred to and enclosed the new lease for them to sign, along with notice to them that the rent was going up from $378 to $500 per month effective 23 days later, September 1, 2006. Paragraph 2 of the lease indicates that it terminated on August 31, 2007, after which it continued on a month-to-month basis.

According to Leo Belanger, in 2006 the floors in the trailer were deteriorating. They "started getting soft...there was no more repairing that because they were all rotting, gone down through." (Tr. 24.) He testified that he had tried to put various pieces of plywood underneath the couch and freezer to bolster the floors, to no avail. (*Id.*) He said that when he told Mr. Mulholland about the floors "coming down, and the back wall was sagging in, the trailer was tipping," the Defendant responded by saying that "he didn't want to do no repair to it, that was my own." (*Id.*)

2

Mr. Belanger further testified that the electrical system was plagued with problems, and that in order to put a light on in the bathroom, one had to hit the wall so the light would come on. However, when the light came on a "flicker, a blue spark" would flash. (Tr. 27.) He said that rodents had chewed the insulation on wires, which he said Mr. Mulholland had paid someone to repair, but "towards the end (of the tenancy) . . . the insulation on it was all unraveling and they were touching together, that was pretty dangerous." (Tr. 28.)

Mr. Belanger testified that mice, rats and squirrels were able to get into the trailer throughout the time he was living there. (Tr. 29.) Mr. Belanger testified that Mr. Mulholland "must have known about" the rodents because he would have seen traps "when he came through the first time" he entered the premises. (Tr. 30.)

The Plaintiff testified that in December of 2008, frozen water pipes burst, resulting in water coming through walls into every room. (Tr. 36.) He stated that he and his grandson tried unsuccessfully to repair it, and so started hauling water from a neighbor to flush the toilet. (Tr. 36.) In addition, he stated that sometimes they had to empty the toilets by scooping out waste products into a bucket that they would take and pour directly into the septic tank. (Tr. 37, 38.) He stated that the Defendant would respond to reports of these conditions by telling him that he "was on my own with that," and explained, "That's why I never ask him anything after that." (Tr. 39.) The Plaintiff stated that he paid rent throughout his tenancy, except for one month where he paid $300, withholding $200 that he says he spent having the septic tank pumped. (Tr. 42.) He later stated that the $200 was withheld for that reason and also because he had to fix the water pipes. (Tr. 102.)

Mr. Belanger testified that having to empty the toilet by hand "made me feel sick and disgusting, the smell. And when that smell got in, you couldn't take it out anymore, you had to

use spray all the time, and the smell was still in . . . the trailer all the time." (Tr. 42.) The Plaintiffs were without water from December 2008 until August 2009. (Tr. 36, 37.) Mr. Belanger testified that he was able to use water from a neighbor to flush the toilet until some time in March of 2009, but that after that "she wouldn't flush no more." (Tr. 39.) This required him to empty the contents of the toilet by hand three times a day and empty it manually into the septic system. (Tr. 38.) Mr. Belanger testified that when he told Mr. Mulholland that the toilet no longer flushed with water, "he said I was on my own with that." (Tr. 39.)

The Plaintiff testified that he had tried to obtain another trailer on two occasions, but that Mr. Mulholland would not agree, saying the first one he wanted to purchase was "too old to get in there," and that Mr. Mulholland said "no" to the second one as well. (Tr. 23.)

On July 31, 2009, the Plaintiff was served with a thirty day Notice to Quit (Pls.' Ex. 12). The Notice states that the reason for the eviction is "removal of trailer." Mr. Belanger stated that his family came to help him move into a new trailer, and that he determined that he had to throw most of his belongings away due to mold. (Tr. 48.) He stated that he lost a freezer full of food because the bottom of the freezer had rotted out. (*Id.*) He did not receive his security deposit back when he moved out at the end of August 2009. (Tr. 49, 50.)

On cross-examination, Mr. Belanger stated that when he moved into the trailer on April 1, 1987, he entered into a lease with the Arnolds. (Tr. 53.) He stated that he had problems with the trailer starting in the 1990s, including problems with water pipes, but that Mr. Arnold repaired them. (Tr. 54-55.) He stated Mr. Arnold also installed a steel plate under radiators where the floors were "spongy." (Tr. 56). Mr. Belanger conceded that on September 11, 2006, he signed a lease with the Defendant indicating that he had examined the premises and "they are at the time of this agreement, in good order, repair, safe, clean and in a tenantable condition." (Def.

4

Ex. 5, ¶ 22.) He stated that the trailer was "all right in the summer, but not in the winter" when pressed by Defendant's counsel. (Tr. 97.)

During his direct testimony the Plaintiff indicated that he did not work, but he conceded on cross-examination that he did in fact have income from delivery of junk metal to Number One Steel. (Tr. 79) He also conceded that the income from that enterprise over three years came to almost $23,000. (Tr. 80.) He claimed that he had the right to earn $11,000 a year "myself, plus my wife." (Tr. 82.)

Lisa Willette, who is married to the Plaintiffs' grandson, testified that she took photographs (Pls.' 14-26) during the months of May and August 2009. She testified that the pictures show rodent damage and debris, water damage, and mold in various places throughout the trailer. She also stated that Germaine Belanger was a "clean" housekeeper, "always cleaning and wiping and picking up after anything." She said she visited the Plaintiffs a couple times a month (Tr. 125) and that the trailer was not large enough to store off-season clothes. (Tr. 126.)

Betty Jean Willette, daughter of the Plaintiffs, also testified. She indicated that she used to be at the trailer "all the time" but that changed because "I had to stop because I couldn't go in it, it would – it just made me feel sick with the smell." (Tr. 149.) She stated she repeatedly told her father to tell the landlord to fix the problems because "it's his place, not yours." (Tr. 150.) She stated that after a time she would only visit them outside the trailer or at her residence. (*Id.*) She stated that she felt "very upset for them because no matter how much my mom tried to clean the place and everything she did, it was still there, and there's nothing she could really do about it but to keep cleaning it and hopefully, it would, you know, take some of the smell away or the landlord would actually come and fix it, and he just didn't fix it." (Tr. 151.)

Ms. Willette testified that she watched her parents "both go downhill. I mean you can tell they didn't feel well. It's really difficult to explain. They used to be really happy and energetic and then you would go to visit them and they would be upset because nothing would be getting done, they would spend some money to try to fix what they could fix, it would break again. . . . My mother would cough a lot, my dad would cough so bad and, I told him, I said you've got to get out of here, it's making you sick." (Tr. 151.)

She described the day she helped them move: "I wore gloves, I wore a mask, it smelled really bad. I told my mom she had to stay out of the bathroom area, that was just very, very disgusting. I told my dad to go outside to get some fresh air, he was getting sick. It was so bad that I had to go outside and actually vomit." (Tr. 152.) She testified that when she got home she threw her clothes away. (Tr. 153.)

She stated that her parents had to throw away numerous bags of clothes and also furniture: "Because it was all molded and mildewed and the rats had eaten my mother's clothes, we threw everything in bags, we piled it out back and then we took it to dispose of it. It was just – there was nothing you could keep . . . . It was very disgusting." (Tr. 153.) She stated that for the first time in her life she saw her dad cry. (*Id.*)

Eric Willette, the Plaintiffs' grandson, testified that he took photographs (admitted as Plaintiffs' Exhibits 27-32) and also that he attempted to repair the broken water pipes at the trailer in December 2008. (Tr. 164-65, 167.) He described the difficulties in keeping the pipes from freezing, given the age and location of the pipes and their apparent incompatibility with newer pipes. (Tr. 165.) He stated that he could see places in the trailer where mold appeared to have resulted from "water leaking in through the walls." (Tr. 166.) He also helped his

grandparents move, and described the "unbelievable smell" emanating from the bedroom and the hallway that caused him to throw up outside. (Tr. 166.)

Mr. Willette indicated that he believed that Mr. Belanger only retained approximately half of the monies he received from the scrap yard because he split the monies he received from the scrap metal sales with Mr. Willette and his work colleagues, who were also making money on collecting scrap that Mr. Belanger took to the yard for all of them. (Tr. 181, 182.)

The Defendant, John Mulholland, testified that his residence is located at the beginning of the road leading to the park where the Plaintiffs resided in the trailer he leased to them. (Tr. 184.) He stated that he purchased the property in October of 2001, but that there are no longer any trailers left in the trailer park. (Tr. 184-85.) He said that he has a number of businesses, including a restaurant, numerous rental properties, and that he also does construction. (Tr. 185.)

Mr. Mulholland testified that when he took over the property he legally assumed any trailer leases that were in existence, including the one the Arnolds had with the Plaintiffs. (Def.'s Ex. 1; Tr. 185-86.) He stated that his purpose in sending the letter to the Plaintiffs on August 8, 2006 (with a new lease enclosed) was to make sure they knew that the rent was going up, and to let them know that they needed to clean up the site. (Tr. 187-88.) He stated he eventually received a signed lease from the Plaintiffs on September 11, 2006. (Def.'s Ex. 5.) Mr. Mulholland believes that the Plaintiffs obtained legal advice before the signing the lease, based on a conversation he had with Mr. Belanger (Tr. 189) and also because the envelope that contained the lease when it was mailed back to him had hand-written on the back the names of two women and "Pine Tree Legal" and a phone number. (Tr. 189-91.) The Plaintiff testified that the handwriting belonged to a lady at Pine Tree Legal with whom he had conferred regarding his complaints against Mr. Mulholland. (Tr. 75.)

7

Mr. Mulholland testified that he was constantly having to tell the Plaintiffs to clean up their site, describing the outside yards as a "mess." (Tr. 200.) He stated that the Plaintiff violated the lease by having more than one storage building, although he eventually did remove one of the buildings a year after the Defendant told him to do so. (Tr. 199.) The Defendant also said that Mr. Belanger did clean up some, but not all of the mess around the yard. (Tr. 202.)

Mr. Mulholland also testified that knew about the problems with the Plaintiffs not having water in December 2008, when he says he "gave them credit," but he did not know the duration of the problem (Tr. 202), which the Plaintiffs claim lasted until March of 2009. He says he could not recall if he ever knew about the toilet backing up. (Tr. 202.)

Mr. Mulholland seemed to suggest that any problems with the septic system on his property were due to the Plaintiffs' insistence on parking their car on the leach field. (Tr. 205.) He said that he heard about the Plaintiffs' complaints about the septic problems from the city code enforcement officer. (Tr. 206.) He stated that he did have the trailer destroyed after the Plaintiffs moved. (*Id.*) He stated that he found large amounts of grease plugging the pipes of the trailer, and he denied that there was any problem with the septic tank being full, because he claims that septic systems by design are "always full." (Tr. 206.) He stated he had never heard any complaints prior to trial about rodents, and that the only problems reported were "problems with the pipes" which he says he fixed. (Tr. 209-10.)

Mr. Mulholland insisted that the only complaints received from the Plaintiffs had to do with the pumping of the septic system. (Tr. 208.) Ultimately, he testified that the Plaintiffs were evicted upon a thirty-day notice to quit because he wanted to close the trailer park, although he had sent them a seven-day notice previously for non-payment, which the Plaintiffs made good. (Tr. 207.) He stated that he did not return the deposit that he had received from the Arnolds in

8

the amount of $183 because of "excessive wear and tear on the trailer, the damage to the septic system, and all the debris that I had to still clean up left behind." (Tr. 209.)

On cross examination, Mr. Mulholland did not recall ever telling the Plaintiffs that he would not make repairs because the trailer was too decrepit and not worth the expenditure of money. (Tr. 215.) Mr. Mulholland denied knowing anything about the warranty of habitability, stating, "I'm not a lawyer, I'm landlord, I don't know." (Tr. 216.) He indicated that the only repairs he made on the property during this tenancy were to pump the septic tank and replace the hot water heater. (Tr. 220.) He did admit that he refused to pump the septic tank again in March of 2009 because it was not his responsibility to do so. (Tr. 220.) He further indicated that the $300 discount he gave the Plaintiffs was for repairing frozen pipes in December, but that he "was only doing it out of the goodness of my heart and that I believed that it was his responsibility to take care of it, according to the lease." (Tr. 230.)

Mr. Mulholland insisted that he had no obligation to repair the premises: "It was my understanding that if you had a lease, because every day in the commercial world, people have triple net leases that are responsible for everything, people have leases where they just rent a pad, a piece of land and build million dollar buildings on them that they're 100 percent responsible for. Why would I think it was any different on a residential lease?" (Tr. 231.) He claimed no knowledge of special landlord-tenant laws, and felt he had no reason to find out what the law required of him as a residential landlord. (Tr. 231-32.) He stated he believed that he was in fact providing a safe and habitable residence for the Plaintiffs. (Tr. 233.) He stated that he "never" drove by the trailer, although the Plaintiffs had to drive by his house whenever they left the park. (Tr. 234.)

## FINDINGS AND CONCLUSIONS

14 M.R.S. § 6021(2) (2010) provides, "In any written or oral agreement for rental of a dwelling unit, the landlord shall be deemed to covenant and warrant that the dwelling is fit for human habitation." The parties in this matter concede that there existed between them a written agreement for rental which expired on August 31, 2007, and an oral agreement going on a "month to month basis" thereafter. (Def.'s Ex. 5.) The court finds that the Defendant has, by operation of law, warranted to the Plaintiffs that the dwelling in question was fit for human habitation. This warranty existed irrespective of the Defendant's professed lack of knowledge of it.[1]

The Defendant argues that Plaintiffs waived the protections of this law when they signed the September 11, 2006 lease which reads: "Lessee stipulates that they have examined the premises and appliances and they are at the time of this agreement, in good order, repair, safe, clean and in a habitable condition." The court finds that no waiver of the warranty occurred in this case. Waiver of the warranty of habitability can only occur in Maine under strictly defined circumstances not present in this case[2], and "[a]ny agreement, other than as provided in this subsection, by a tenant to waive any of the rights or benefits provided by [the statutory warranty of habitability] is void." 14 M.R.S. § 6021(5) (2010).

---

[1] The Plaintiffs suggest that Mr. Mulholland had to have known about the existence of the warranty of habitability given his prior involvement in a landlord-tenant dispute that was litigated all the way to the Law Court. See John Mulholland v. Karl Poole, 2005 ME 18, 866 A.2d 122. While that case does reference the warranty in footnote 3, it was in fact a retaliation claim brought by a tenant who had apparently agreed to make repairs to the trailer he rented (described, along with Mr. Mulholland's other rental trailers, as "old and in very poor condition" (id. at ¶ 2, 866 A.2d at 123)) in exchange for rent reduction. The court does not believe it can infer Mr. Mulholland's state of knowledge of the warranty of habitability from the fact of his prior involvement in this retaliation lawsuit.

[2] 14 M.R.S. § 6021(5) allows for a waiver of the warranty only by written agreement when "the tenant accepts specified conditions which may violate the warranty of fitness for human habitation in return for a stated reduction in rent or other specified fair consideration."

10

The court finds that the Plaintiffs were without water for nine months. The court further finds that the Plaintiffs had no functioning toilet for five months from some time in March of 2009 until they moved. The court further finds that Mr. Mulholland had actual notice of these problems. He had actual notice that the pipes had frozen in December 2008, and had actual notice that the toilet stopped functioning some time in March 2009. The court finds Mr. Belanger credible, and he testified that he told Mr. Mulholland about these problems. It is clear both from his testimony and from the testimony of Mr. Mulholland that Mr. Belanger eventually stopped complaining of these conditions due to Mr. Mulholland's steadfast belief and consistent statements that he had absolutely no obligation to provide running water or a functioning toilet.

The court further finds that the conditions described, not only by Mr. Belanger, but also by his family members who testified, were of sufficient magnitude as to "materially impair the health or safety" of the Belangers. While the court cannot find on this record that Mr. Mulholland had actual knowledge of the extent of the mold and rodent infestation problem, the lack of water for nine months and the failure to provide a functioning toilet for five months are together sufficient to convince the court that the trailer in question was not fit for human habitation. The testimony of the family members and their descriptions of the horrific smells make it clear to the court that the Belangers endured deplorable conditions during this period of time.

Mr. Mulholland stated a firm belief that residential tenants have no more rights than commercial tenants, and he seemed to have intended in the lease to shift responsibility to the tenant for virtually all aspects of maintenance and repairs.[3] The court finds that Mr. Mulholland

---

[3] The Plaintiff suggests that the lease is internally inconsistent and is therefore void. The Defendant claims that the lease provided for a valid waiver by the tenant of the warranty of habitability. Because the court finds that there has been no waiver, and because the evidence is so strong as to the lack of habitability during the period in question, the court finds it unnecessary to consider the issue of

did believe he could shift responsibility to the Plaintiffs for the lack of water and appropriate plumbing. However, his conduct and statements actually corroborate the Plaintiffs' claim that he knew what the conditions were. The court finds that he knew that the conditions fell below statutorily required standards, and that he drafted the lease upon the mistaken belief that he could simply bargain away the responsibilities imposed upon him by the Maine Legislature.[4]

Therefore, as to Count I, the court will enter Judgment for the Plaintiffs on their claim that Mr. Mulholland violated the warranty of habitability, and finds that he had actual notice by sometime in March 2009 of the two conditions which in combination constitute the violation found herein. Damages assessed on this Count will be $2500. This sum is based upon the presumption in the statute, not rebutted on this record, that the rental amount equals the fair value of the trailer had it been free from the conditions that rendered it unfit during this period, specifically the months of April through August of 2009.

The court declines to award damages pursuant to 14 M.R.S. § 6016 (2010), which prohibits increasing rent "if the dwelling unit is in violation of the warranty of habitability." The court construes this language as requiring the Plaintiffs to prove that the rent was increased during a lease term when the dwelling was uninhabitable. The rent was increased in 2006, and the court has herein found a violation of the warranty only for a five-month period in 2009.

The court further declines to award damages for violation of 14 M.R.S. § 6015. While it does appear that Mr. Mulholland did not give sufficient notice as required by this statute (45

---

inconsistency of terms and make a finding as to whether the lease is, in whole or in part, void. The court views the warranty of habitability to trump, under these facts, any provision in the lease which seems to suggest that the Belangers were "on their own" when it came to providing water and a functioning toilet during the months in question.

[4] In *Hammerle v. Rapa,* 1999 Me. Super. LEXIS 115, *4, Superior Court Justice Warren found that the statute when read as a whole "contemplates that the landlord need only have actual notice (as opposed to written notice) of the unfit condition." The court finds his reasoning persuasive as to the issue of notice in this case, namely that the warranty was in effect although no written notice was given to Mr. Mulholland. The statute limits relief available as of the date actual notice is received by the landlord.

days) that rent would increase, this statutory provision was not pled in either the original or amended complaint. In addition, while Plaintiffs' counsel mentioned this violation, it appears that the Plaintiffs have abandoned this argument in the section of their brief entitled "Remedies/Statutory Claims."

With respect to Count III, Wrongful Retention of Security Deposit, the court finds in favor of the Plaintiffs. The court does not find credible the Defendant's claim that it was withheld due to "excessive wear and tear." It is clear to the court that Mr. Mulholland knew very early on that the trailer in question was quite old and needed constant maintenance and repair; he simply did not believe he had any obligation to maintain or repair it. It is also clear to the court that Mr. Mulholland was simply "waiting out" the Belangers so that he would no longer have to deal with trailers or tenants. However, the court finds that the deplorable conditions of the premises were not caused by the Plaintiffs, but were a function of the age of the trailer in combination with Mr. Mulholland's violation of the warranty of habitability during the last months of the tenancy. The court will therefore enter judgment for the Plaintiffs on Count III.

As to Counts II, IV and V, the Plaintiffs allege that the conditions which constitute the violation of the warranty of habitability also constitute breaches of certain common law duties. Specifically, those Counts allege negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.

The Maine Supreme Court in *Chiu v. City of Portland*, 2002 ME 8, ¶ 11, 788 A.2d 183, 187, reiterated the rule of *Nichols v. Marsden*, 483 A.2d 341, 343 (Me. 1984) that "a landlord is not liable to a tenant for personal injuries caused by a defective condition in premises under the tenant's exclusive control." In *Chiu*, the plaintiffs brought multiple claims against a landlord and certain persons involved in conducting housing inspections for the City of Portland. *Chiu*, 2002

ME 8, ¶ 1, 788 A.2d at 185. The plaintiff tenants' child was injured when he fell three stories to the ground through a defective window. *Id.* at ¶ 2, 788 A.2d at 186. The *Chiu* plaintiffs urged the Court to abandon the rule of *Nichols v. Marsden,* 483 A.2d 341 (Me. 1984), as well as seeking damages for negligence, alleging breach of the landowners' duty of reasonable care as well as for breach of the statutory warranty of habitability. *Chiu,* 2002 ME 8, ¶ 7, 788 A.2d at 186. The Chius' first negligence claim survived summary judgment because the Court found a material issue of fact as to one of the principal elements required to overcome what the Court called "the shield from liability articulated in *Nichols,*" namely, the issue of control. *Chiu,* 2002 ME 8, ¶ 12, 788 A.2d at 187.[5] In addressing the Chius' claims that are most analogous to those at issue in the present case, relating to the landowner's duty to his tenants and to the remedy for breach of the statutory warranty of habitability, the Law Court stated that the lessors' "duty as landowners must be analyzed according to the law governing landlord-tenant relations" and was therefore subject to the *Nichols* rule generally shielding the landlord from liability for conditions on premises within the tenants' exclusive control. *Chiu,* 2002 ME 8, ¶ 15 n. 6, 788 A.2d at 188 (citing *Young v. Libby,* 1999 ME 139, ¶ 12, 737 A.2d 1071, 1074; *Golf Club Co. v. Rothstein,* 97 Ga. App. 128, 102 S.E.2d 654, 656 (Ga. Ct. App. 1958)). In the same footnote, the Law Court ruled that "consequential damages are an inappropriate remedy for breach of the warranty of habitability." *Id.*

There are, of course, certain recognized exceptions to the general rule of landlord non-liability. However, in this case, the Plaintiffs have failed to articulate, much less establish, any exceptions to the *Nichols* rule which might provide them a way around this shield. The court therefore finds for the Defendant on Count II.

---

[5] In this case, there is no evidence that the freestanding trailer in which the Plaintiffs resided was under any control other than their own.

Count IV is a claim for intentional infliction of emotional distress. The Law Court has upheld a jury verdict awarding plaintiff tenants damages based upon this intentional tort. *See Harris v. Soley*, 2000 ME 150, 756 A.2d 499[6]. The Court has also established four elements which must be proven by the Plaintiff. Those elements, most recently set forth in *Lyman v. Huber*, 2010 ME 139, ¶ 16, ___ A.2d ___, are as follows:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [the defendant's] conduct;
>
> (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;
>
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
>
> (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

While the court has found in this case that the conditions endured for five months by the Plaintiffs were deplorable, and that the trailer was unfit for habitation during this period, the Plaintiffs have failed to establish by a preponderance of the evidence the kind of intentional or reckless conduct necessary to establish the first element. As the Court stated in *Lyman*, "a person acts intentionally if the person subjectively wants or subjectively foresees that harm to another will almost certainly result" from his actions. *Lyman*, 2010 ME 139, ¶ 18, ___ A.2d at ___ (quoting *Curtis v. Porter*, 2001 ME 158, ¶ 12, 784 A.2d 18, 23 (2001)) (brackets omitted). In addition, a person acts "recklessly if the person knows that the person's conduct creates an unreasonable risk of harm to another person and the unreasonableness of the person's actions

---

[6] Default judgment on the merits was entered against the defendant in *Harris*, and the case went to the jury on the issue of damages only. *Harris*, 2000 ME 150, ¶ 1, 756 A.2d at 502. Among the common law claims upheld in *Harris* were conversion, intentional infliction of emotional distress, and punitive damages. *Id.* at ¶ 7, 756 A.2d at 503. These were brought in addition to a claim for breach of warranty of habitability, wrongful eviction, and wrongful retention of their security deposit. *Id.* at ¶ 7, 756 A.2d at 503-04. No claim for negligence or negligent infliction of emotional distress was brought in that case.

exceed negligence." *Id.* (quoting *Curtis v. Porter,* 2001 ME 158, ¶ 13, 784 A.2d at 23) (brackets omitted).

The conduct of the defendant in this case, in contrast to the conduct of the landlords in *Harris,* cannot be described in such extreme terms. While it appears that Mr. Mulholland turned a blind eye towards the degree to which conditions in the trailer had deteriorated, and those conditions' arguably foreseeable effects, the court cannot find that his conduct amounted to the kind of intentional or reckless conduct required for intentional infliction of emotional distress.[7] The cases began comparably; the *Harris* tenants alleged "repeated broken promises to fix the numerous problems with the tenants' apartment, [the landlord's] refusal to fix the apartment following an inspection by the Portland Code Enforcement Officer . . . and the continuing condemnation of the premises as unfit for human occupation." *Harris,* 2000 ME 150, ¶ 22, 756 A.2d at 507. However, the basis for the court's determination that the damages awarded were not unreasonable consists of this behavior in conjunction with behavior much more intrusive and much more particularized to the individual tenants. While the tenants were in the process of moving out of the apartment, the landlord sent agents into the apartment to remove the tenants' remaining possessions, some of which were never recovered even after the police intervened. *Id.* at ¶ 4, 756 A.2d at 503, 509. When the tenants confronted the landlord seeking return of their possessions, the landlord "told the tenants that he knew where they were moving and where their families lived, a statement that the tenants took as a threat." *Id.* at ¶ 5, 756 A.2d at 503. Thus, in *Harris,* the Law Court found, "The degree of reprehensibleness of the conduct in this case has been established as severe." *Id.* at ¶ 32, 756 A.2d at 509. It upheld the damages award not only

---

[7] Moreover, even if the court were to find that the defendant acted "recklessly," the conduct at issue is not "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community" (*Lyman,* 2010 ME 139, ¶ 16, ___ A.2d at ___), as discussed herein.

16

because of the landlord's refusal to repair conditions that rendered the apartment unfit for human occupation, but also because "the violent removal of tenants' property before eviction proceedings had proceeded, the retention of property belonging to the tenants, the destruction of their property, and [the landlord's] threatening behavior combined to create a pattern of conduct that must be considered intolerable." *Id.* Because Mr. Mulholland's conduct regarding the Plaintiffs' living conditions falls short of the "intentional or reckless" standard required for the establishment of the tort of intentional infliction of emotional distress, as well as the degree of extreme or outrageous reprehensibleness, the court will enter judgment for Mr. Mulholland on count IV.

With respect to Count V, negligent infliction of emotional distress, the Law Court has "recognized a duty to act reasonably to avoid emotional harm to others in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed." *Curtis v. Porter,* 2001 ME 158, ¶ 19, 784 A.2d 18, 25 (footnote omitted); *see also id.* at ¶ 18, 784 A.2d at 25 ("Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others."). The Law Court has held that a claim for negligent infliction of emotional distress may also lie when the wrongdoer has committed another tort. *Id.* at ¶ 19, 784 A.2d at 26. However, when the separate tort allows recovery for emotional suffering, the claim for negligent infliction of emotional distress is usually subsumed in any award under that separate tort. *Id.*

Clearly, this is not a case of bystander liability. In addition, while the Law Court has treated the relationship between tenants and landlords as "special" in that it has consistently

limited the causes of action that may be brought by tenants against landlords, this legal relationship does not seem to be comparable to the legal relationships that have been found to be "special" for purposes of this tort. *See Rowe v. Bennett*, 514 A.2d 802 (Me. 1986) (psychotherapist-patient); *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, 738 A.2d 839 (recognizing that a special relationship between a religious organization and a victim of clergy sexual abuse may give rise to a duty on the part of the organization to prevent harm caused by the intentional acts of its clergy); *cf. Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, 871 A.2d 1208 (finding fiduciary duty on the part of religious organization based in part upon *Bryan R.*). Further, because the court has found that no other tort has been committed, the Plaintiff cannot bring an action for negligent infliction of emotional distress on that basis. Because none of the established bases for a duty to avoid negligently causing emotional harm applies to this case, the court will therefore enter judgment for Mr. Mulholland on Count V.

With respect to Count VI, the claim for punitive damages, the court must enter judgment for Mr. Mulholland. In Maine, "[p]unitive damages . . . will lie only when the plaintiff receives compensatory or actual damages based on the defendant's tortious conduct." *DiPietro v. Boynton*, 628 A.2d 1019, 1025 (Me. 1993). Moreover, to be eligible for a punitive damages award, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice. *Tuttle v. Raymond*, 494 A.2d 1353, 1363 (Me. 1985). The Plaintiffs have not established tortious conduct in this case there is no express provision for punitive damages under either statutory provision under which the Plaintiffs have recovered, and they have failed to meet their burden of establishing express or implied malice by clear and convincing evidence.

The entry will be:

1. On Count I, Judgment is entered for the Plaintiffs in the amount of $2500 for breach of the warranty of habitability.

2. On Count II, Judgment is entered for Defendant.

3. On Count III, Judgment is entered for Plaintiffs in the amount of $183.

4. On Count IV, Judgment is entered for Defendant.

5. On Count V, Judgment is entered for Defendant.

6. On Count VI, Judgment is entered for Defendant.

7. Plaintiffs shall have their costs.

_1 / 4 / 11_

**DATE**

**SUPERIOR COURT JUSTICE**

19

LEO BELANGER  - PLAINTIFF

Attorney for: LEO BELANGER
JUDITH A PLANO  - RETAINED 05/29/2009
PINE TREE LEGAL ASSISTANCE
39 GREEN STREET
PO BOX 2429
AUGUSTA ME 04338-2429

Attorney for: LEO BELANGER
PETER B BICKERMAN  - RETAINED 05/26/2010
PINE TREE LEGAL ASSISTANCE
39 GREEN STREET
PO BOX 2429
AUGUSTA ME 04338-2429

GERMAINE BELANGER  - PLAINTIFF

Attorney for: GERMAINE BELANGER
JUDITH A PLANO  - RETAINED 05/29/2009
PINE TREE LEGAL ASSISTANCE
39 GREEN STREET
PO BOX 2429
AUGUSTA ME 04338-2429

Attorney for: GERMAINE BELANGER
PETER B BICKERMAN  - RETAINED 05/26/2010
PINE TREE LEGAL ASSISTANCE
39 GREEN STREET
PO BOX 2429
AUGUSTA ME 04338-2429


vs
JOHN MULHOLLAND  - DEFENDANT
7 WALTER ROAD
AUGUSTA ME 04330
Attorney for: JOHN MULHOLLAND
PASQUALE PERRINO  - RETAINED
LAW OFFICE OF PJ PERRINO JR
128 STATE STREET
PO BOX 49
AUGUSTA ME 04332

SUPERIOR COURT
KENNEBEC, ss.
Docket No  AUGSC-CV-2009-00163


**DOCKET RECORD**

Filing Document: COMPLAINT                    Minor Case Type: OTHER STATUTORY ACTIONS
Filing Date: 05/29/2009

## Docket Events:
05/29/2009 FILING DOCUMENT - COMPLAINT FILED ON 05/29/2009
          Plaintiff's Attorney:  JUDITH A PLANO

06/04/2009 Party(s):  LEO BELANGER
          ATTORNEY - RETAINED ENTERED ON 05/29/2009
          Plaintiff's Attorney: JUDITH A PLANO

Party(s):  GERMAINE BELANGER
ATTORNEY - RETAINED ENTERED ON 05/29/2009
Plaintiff's Attorney: JUDITH A PLANO

06/04/2009 CERTIFY/NOTIFICATION - CASE FILE NOTICE SENT ON 05/29/2009

06/16/2009 Party(s):  JOHN MULHOLLAND
SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 06/09/2009
ORIGINAL SUMMONS WITH RETURN SERVICE ON JHN MULHOLLAND

06/26/2009 Party(s):  JOHN MULHOLLAND
RESPONSIVE PLEADING - ANSWER FILED ON 06/26/2009
Defendant's Attorney: PASQUALE PERRINO

06/26/2009 Party(s):  JOHN MULHOLLAND
ATTORNEY - RETAINED ENTERED ON 06/26/2009
Defendant's Attorney: PASQUALE PERRINO

06/26/2009 DISCOVERY FILING - DISCOVERY DEADLINE ENTERED ON 02/26/2010

ASSIGNMENT - SINGLE JUDGE/JUSTICE ASSIGNED TO JUSTICE ON 06/26/2009
JOSEPH M JABAR , JUSTICE

06/26/2009 ORDER - SCHEDULING ORDER ENTERED ON 06/26/2009
JOSEPH M JABAR , JUSTICE
ORDERED INCORPORATED BY REFERENCE AT THE SPECIFIC DIRECTION OF THE COURT.  COPIES TO
PARTIES/COUNSEL

09/01/2009 Party(s):  LEO BELANGER,GERMAINE BELANGER
ADR - NOTICE OF ADR PROCESS/NEUTRAL FILED ON 08/25/2009
Plaintiff's Attorney:  JUDITH A PLANO
MEDIATION TO BE SCHEDULED FOR SOMETIME IN SEPTEMBER BEFORE DEBBIE MATTSON.

09/10/2009 Party(s):  LEO BELANGER,GERMAINE BELANGER
ADR - NOTICE OF ADR PROCESS/NEUTRAL FILED ON 09/10/2009
Plaintiff's Attorney:  JUDITH A PLANO
MEDIATION SCHEDULED FOR 9/15/09 BEFORE DEBBIE MATTSON

12/28/2009 Party(s):  JOHN MULHOLLAND
OTHER FILING - WITNESS & EXHIBIT LIST FILED ON 12/18/2009
Defendant's Attorney: PASQUALE PERRINO

02/19/2010 Party(s):  LEO BELANGER,GERMAINE BELANGER
RESPONSIVE PLEADING - RESPONSE FILED ON 02/19/2010
Plaintiff's Attorney:  JUDITH A PLANO
TO DEFENDANT'S OBJECTION TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS AND
INTERROGATORIES PROPOUNDED UPON DEFENDANT.

03/04/2010 HEARING - TRIAL MANAGEMENT CONFERENCE SCHEDULED FOR 04/07/2010 @ 1:00
NOTICE TO PARTIES/COUNSEL

03/04/2010 HEARING - TRIAL MANAGEMENT CONFERENCE NOTICE SENT ON 03/04/2010

03/04/2010 TRIAL - TRAILING LIST SCHEDULED FOR 04/12/2010


03/19/2010 Party(s):  LEO BELANGER,GERMAINE BELANGER
           MOTION - MOTION TO CONTINUE FILED ON 03/19/2010
           Plaintiff's Attorney:  JUDITH A PLANO
           FAXED MTN. TO JUSTICE CLIFFORD


03/19/2010 OTHER FILING - STATEMENT OF TIME FOR TRIAL FILED ON 12/18/2009
           Defendant's Attorney: PASQUALE PERRINO
           ESTIMATED TIME FOR TRIAL IS 1 DAY.


03/19/2010 OTHER FILING - STATEMENT OF TIME FOR TRIAL FILED ON 12/10/2009
           Plaintiff's Attorney:  JUDITH A PLANO
           ESTIMATED TIME FOR TRIAL IS 1 DAY.


03/22/2010 Party(s):  LEO BELANGER,GERMAINE BELANGER
           MOTION - MOTION TO CONTINUE GRANTED ON 03/19/2010
           ROBERT W CLIFFORD , ASSOCIATE JUSTICE
           COPIES TO PARTIES/COUNSEL                                          MOTION GRATNED
           AS REQUESTED. CASE CONTINUED FROM APRIL VIVIL TRIAL LIST. CLERK TO R E SCHEDULE.


03/22/2010 HEARING - TRIAL MANAGEMENT CONFERENCE CONTINUED ON 03/19/2010
           ROBERT W CLIFFORD , ASSOCIATE JUSTICE
           CONTINUED TO NEXT TRIAL LIST.


03/22/2010 TRIAL - TRAILING LIST CONTINUED ON 03/19/2010
           ROBERT W CLIFFORD , ASSOCIATE JUSTICE
           TO NEXT TRIAL LIST.


03/31/2010 ASSIGNMENT - SINGLE JUDGE/JUSTICE ASSIGNED TO JUSTICE ON 03/31/2010
           JOHN  NIVISON , JUSTICE


05/26/2010 Party(s):  LEO BELANGER,GERMAINE BELANGER
           LETTER - FROM PARTY FILED ON 05/26/2010
           Plaintiff's Attorney:  PETER B BICKERMAN
           CO-COUNSEL


05/26/2010 Party(s):  LEO BELANGER
           ATTORNEY - RETAINED ENTERED ON 05/26/2010
           Plaintiff's Attorney: PETER B BICKERMAN


05/26/2010 Party(s):  GERMAINE BELANGER
           ATTORNEY - RETAINED ENTERED ON 05/26/2010
           Plaintiff's Attorney: PETER B BICKERMAN


05/26/2010 Party(s):  LEO BELANGER,GERMAINE BELANGER
           DISCOVERY FILING - RULE 26(G) LETTER FILED ON 05/26/2010
           Plaintiff's Attorney:  PETER B BICKERMAN


06/03/2010 HEARING - 26(G) CONFERENCE REQUESTED ON 05/26/2010
           Plaintiff's Attorney:  PETER B BICKERMAN


06/03/2010 HEARING - 26(G) CONFERENCE SCHEDULED FOR 06/02/2010 @ 12:00

NOTICE TO PARTIES/COUNSEL

06/03/2010 HEARING - 26(G) CONFERENCE HELD ON 06/03/2010
        DONALD H MARDEN , JUSTICE
        Defendant's Attorney: PASQUALE PERRINO
        Plaintiff's Attorney:  PETER B BICKERMAN
        AFTER CONFERENCE WITH COUNSEL, POSITION WITHDRAWN; 30 DAYS TO RESPOND TO DISCOVERY
        REQUEST.

06/04/2010 HEARING - TRIAL MANAGEMENT CONFERENCE SCHEDULED FOR 07/06/2010 @ 10:30
        NOTICE TO PARTIES/COUNSEL

06/04/2010 HEARING - TRIAL MANAGEMENT CONFERENCE NOTICE SENT ON 06/04/2010

06/04/2010 TRIAL - TRAILING LIST SCHEDULED FOR 09/13/2010

07/07/2010 HEARING - TRIAL MANAGEMENT CONFERENCE HELD ON 07/06/2010
        DONALD H MARDEN , JUSTICE
        Defendant's Attorney: PASQUALE PERRINO
        Plaintiff's Attorney:  PETER B BICKERMAN
        SETTLEMENT CONFERENCE

07/07/2010 HEARING - SETTLEMENT CONFERENCE SCHEDULED FOR 07/14/2010 @ 9:00
        DONALD H MARDEN , JUSTICE
        NOTICE TO PARTIES/COUNSEL

07/07/2010 HEARING - SETTLEMENT CONFERENCE NOTICE SENT ON 07/07/2010

07/14/2010 HEARING - SETTLEMENT CONFERENCE HELD ON 07/14/2010
        DONALD H MARDEN , JUSTICE
        Defendant's Attorney: PASQUALE PERRINO
        Plaintiff's Attorney:  JUDITH A PLANO
        ALSO PRESENT FOR PLAINTIFFS PETER BICKERMAN, ESQ.                      CASE NOT
        SETTLED.

07/23/2010 HEARING - TRIAL MANAGEMENT CONFERENCE SCHEDULED FOR 08/27/2010 @ 1:30  in Room No.  4
        NOTICE TO PARTIES/COUNSEL

07/23/2010 HEARING - TRIAL MANAGEMENT CONFERENCE NOTICE SENT ON 07/23/2010

07/23/2010 HEARING - TRIAL MANAGEMENT CONFERENCE SCHEDULED FOR 08/27/2010 @ 2:00  in Room No.  4
        NOTICE TO PARTIES/COUNSEL

07/23/2010 HEARING - TRIAL MANAGEMENT CONFERENCE NOTICE SENT ON 07/23/2010

08/06/2010 Party(s):  LEO BELANGER,GERMAINE BELANGER
        MOTION - MOTION FOR LEAVE FILED ON 08/03/2010
        Plaintiff's Attorney:  JUDITH A PLANO
        TO FILE SUPPLEMENTAL COMPLAINT, WITH INCORPORATED MEMORANDUM OF LAW.

08/17/2010 Party(s):  JOHN MULHOLLAND
        OTHER FILING - OPPOSING MEMORANDUM FILED ON 08/17/2010
        Defendant's Attorney: PASQUALE PERRINO

TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINT.

08/25/2010 Party(s): JOHN MULHOLLAND
           RESPONSIVE PLEADING - ANSWER TO SUPPLEMENTAL COMP. FILED ON 08/24/2010
           Defendant's Attorney: PASQUALE PERRINO

08/27/2010 Party(s): LEO BELANGER,GERMAINE BELANGER
           OTHER FILING - REPLY MEMORANDUM FILED ON 08/24/2010
           Plaintiff's Attorney: PETER B BICKERMAN

08/30/2010 HEARING - TRIAL MANAGEMENT CONFERENCE HELD ON 08/27/2010
           M MICHAELA MURPHY , JUSTICE
           Defendant's Attorney: PASQUALE PERRINO
           Plaintiff's Attorney: JUDITH A PLANO
           PETER BICKERMAN, ESQ.

08/30/2010 ORDER - PRETRIAL/STATUS ENTERED ON 08/27/2010
           M MICHAELA MURPHY , JUSTICE
           CASE SET FOR 9/21/10 AT 9:00 A.M.                              COPIES TO
           PARTIES/COUNSEL

08/30/2010 HEARING - TRIAL MANAGEMENT CONFERENCE HELD ON 08/27/2010

08/30/2010 TRIAL - BENCH SCHEDULED FOR 09/21/2010 @ 9:00  in Room No.  4

09/22/2010 ASSIGNMENT - SINGLE JUDGE/JUSTICE ASSIGNED TO JUSTICE ON 09/22/2010
           M MICHAELA MURPHY , JUSTICE

09/27/2010 OTHER FILING - TRANSCRIPT FILED ON 09/22/2010
           COPY MAILED TO JANET COOK AND TO ER ON 9/27/10.

09/28/2010 OTHER FILING - TRANSCRIPT FILED ON 09/28/2010
           Reporter: JANETTE COOK
           TRIAL, 9/21/10

09/28/2010 TRIAL - BENCH HELD ON 09/21/2010
           M MICHAELA MURPHY , JUSTICE
           Defendant's Attorney: PASQUALE PERRINO
           Plaintiff's Attorney: JUDITH A PLANO          Reporter: JANETTE COOK
           ALSO PRESENT: PETER BICKERMAN, ESQ. FOR PLTF

09/28/2010 TRIAL - TRAILING LIST HELD ON 09/21/2010

10/13/2010 Party(s): LEO BELANGER,GERMAINE BELANGER
           OTHER FILING - TRIAL BRIEF FILED ON 10/12/2010
           Plaintiff's Attorney: PETER B BICKERMAN
           CLOSING ARGUMENT AND POST-TRIAL BRIEF

11/02/2010 Party(s): JOHN MULHOLLAND
           OTHER FILING - TRIAL BRIEF FILED ON 11/02/2010
           Defendant's Attorney: PASQUALE PERRINO

01/05/2011 Party(s): LEO BELANGER,GERMAINE BELANGER

MOTION - MOTION FOR LEAVE GRANTED ON 08/27/2010
M MICHAELA MURPHY , JUSTICE
AT TMC

01/05/2011 FINDING - JUDGMENT DETERMINATION ENTERED ON 01/04/2011
M MICHAELA MURPHY , JUSTICE
ORDERED INCORPORATED BY REFERENCE AT THE SPECIFIC DIRECTION OF THE COURT. COPY TO ATTYS
PERRINO AND PLANO

ORDER - COURT JUDGMENT ENTERED ON 01/04/2011
M MICHAELA MURPHY , JUSTICE
ORDERED INCORPORATED BY REFERENCE AT THE SPECIFIC DIRECTION OF THE COURT. COPY TO ATTYS
PERRINO, PLANO, AND BICKERMAN
Judgment entered on COUNT 1 for LEO BELANGER, GERMAINE BELANGER and against JOHN MULHOLLAND in
the amount of $2500.00.
Judgment entered on COUNT 2 for JOHN MULHOLLAND and against LEO BELANGER, GERMAINE BELANGER.
Judgment entered on COUNT 3 for LEO BELANGER, GERMAINE BELANGER and against JOHN MULHOLLAND in
the amount of $183.00.
Judgment entered on COUNT 4 for JOHN MULHOLLAND and against LEO BELANGER, GERMAINE BELANGER.
Judgment entered on COUNT 5 for JOHN MULHOLLAND and against LEO BELANGER, GERMAINE BELANGER.
Judgment entered on COUNT 6 for JOHN MULHOLLAND and against LEO BELANGER, GERMAINE BELANGER.
Judgment entered on COUNT 7 for LEO BELANGER, GERMAINE BELANGER and against JOHN MULHOLLAND.
PLAINTIFFS SHALL HAVE THEIR COSTS

01/05/2011 FINDING - FINAL JUDGMENT CASE CLOSED ON 01/05/2011

01/05/2011 FINDING - FINAL JUDGMENT CASE CLOSED ON 01/05/2011

01/05/2011 NOTE - OTHER CASE NOTE ENTERED ON 01/05/2011
NOTICE OF REMOVAL OF EXHIBITS MAILED TO ATTYS PERRINO, PLANO, BICKERMAN

01/05/2011 ORDER - COURT JUDGMENT COPY TO REPOSITORIES ON 01/05/2011
GOSS DATA SERVICE, DEBORAH FIRESTONE, GARBRECHT LAW LIBRARY

A TRUE COPY
ATTEST: _____
Clerk